(Slip Opinion) OCTOBER TERM, 2019 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ESPINOZA ET AL. *v.* MONTANA DEPARTMENT OF REVENUE ET AL.

### CERTIORARI TO THE SUPREME COURT OF MONTANA

No. 18–1195.  Argued January 22, 2020—Decided June 30, 2020

The Montana Legislature established a program that grants tax credits to those who donate to organizations that award scholarships for private school tuition.  To reconcile the program with a provision of the Montana Constitution that bars government aid to any school "controlled in whole or in part by any church, sect, or denomination," Art. X, §6(1), the Montana Department of Revenue promulgated "Rule 1," which prohibited families from using the scholarships at religious schools.  Three mothers who were blocked by Rule 1 from using scholarship funds for their children's tuition at Stillwater Christian School sued the Department in state court, alleging that the Rule discriminated on the basis of their religious views and the religious nature of the school they had chosen.  The trial court enjoined Rule 1.  Reversing, the Montana Supreme Court held that the program, unmodified by Rule 1, aided religious schools in violation of the Montana Constitution's no-aid provision.  The Court further held that the violation required invalidating the entire program.

*Held*: The application of the no-aid provision discriminated against religious schools and the families whose children attend or hope to attend them in violation of the Free Exercise Clause of the Federal Constitution.  Pp. 6–22.

(a) The Free Exercise Clause "protects religious observers against unequal treatment" and against "laws that impose special disabilities on the basis of religious status." *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. ___, ___.  In *Trinity Lutheran*, this Court held that disqualifying otherwise eligible recipients from a public benefit "solely because of their religious character" imposes "a penalty on the free exercise of religion that triggers the most exacting scrutiny."

*Id.*, at ___. Here, the application of Montana's no-aid provision excludes religious schools from public benefits solely because of religious status. As a result, strict scrutiny applies. Pp. 6–12.

(b) Contrary to the Department's contention, this case is not governed by *Locke* v. *Davey,* 540 U. S. 712. The plaintiff in *Locke* was denied a scholarship "because of what he proposed *to do*—use the funds to prepare for the ministry," an essentially religious endeavor. *Trinity Lutheran*, 582 U. S., at ___. By contrast, Montana's no-aid provision does not zero in on any essentially religious course of instruction but rather bars aid to a religious school "simply because of what it is"— a religious school. *Id.*, at ___. *Locke* also invoked a "historic and substantial" state interest in not funding the training of clergy, 540 U. S., at 725, but no comparable tradition supports Montana's decision to disqualify religious schools from government aid. Pp. 12–16.

(c) The proposed alternative approach involving a flexible case-by-case analysis is inconsistent with *Trinity Lutheran*. The protections of the Free Exercise Clause do not depend on a varying case-by-case analysis regarding whether discrimination against religious adherents would serve ill-defined interests. Pp. 16–18.

(d) To satisfy strict scrutiny, government action "must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests." *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 546. Montana's interest in creating greater separation of church and State than the Federal Constitution requires "cannot qualify as compelling" in the face of the infringement of free exercise here. *Trinity Lutheran*, 582 U. S., at ___. The Department's argument that the no-aid provision actually promotes religious freedom is unavailing because an infringement of First Amendment rights cannot be justified by a State's alternative view that the infringement advances religious liberty. The Department's argument is especially unconvincing because the infringement here broadly burdens not only religious schools but also the families whose children attend them. The Department suggests that the no-aid provision safeguards public education by ensuring that government support is not diverted to private schools, but that interest does not justify a no-aid provision that requires only religious private schools to bear its weight. Pp. 18–20.

(e) Because the Free Exercise Clause barred the application of the no-aid provision here, the Montana Supreme Court had no authority to invalidate the program on the basis of that provision. The Department argues that the invalidation of the entire program prevented a free exercise violation, but the Department overlooks the Montana Supreme Court's threshold error of federal law. Had the Montana Supreme Court recognized that the application of the no-aid provision was barred by the Free Exercise Clause, the Court would have had no

basis for invalidating the program. The Court was obligated to disregard the no-aid provision and decide this case consistent with the Federal Constitution. Pp. 20–22.

393 Mont. 446, 435 P. 3d 603, reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which THOMAS, ALITO, GORSUCH, and KAVANAUGH, JJ., joined. THOMAS, J., filed a concurring opinion, in which GORSUCH, J., joined. ALITO, J., and GORSUCH, J., filed concurring opinions. GINSBURG, J., filed a dissenting opinion, in which KAGAN, J., joined. BREYER, J., filed a dissenting opinion, in which KAGAN, J., joined as to Part I. SOTOMAYOR, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 18–1195

### KENDRA ESPINOZA, ET AL., PETITIONERS *v.* MONTANA DEPARTMENT OF REVENUE, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF MONTANA

[June 30, 2020]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

The Montana Legislature established a program to provide tuition assistance to parents who send their children to private schools. The program grants a tax credit to anyone who donates to certain organizations that in turn award scholarships to selected students attending such schools. When petitioners sought to use the scholarships at a religious school, the Montana Supreme Court struck down the program. The Court relied on the "no-aid" provision of the State Constitution, which prohibits any aid to a school controlled by a "church, sect, or denomination." The question presented is whether the Free Exercise Clause of the United States Constitution barred that application of the no-aid provision.

## I
### A

In 2015, the Montana Legislature sought "to provide parental and student choice in education" by enacting a scholarship program for students attending private schools. 2015 Mont. Laws p. 2168, §7. The program grants a tax

credit of up to $150 to any taxpayer who donates to a participating "student scholarship organization." Mont. Code Ann. §§15–30–3103(1), –3111(1) (2019). The scholarship organizations then use the donations to award scholarships to children for tuition at a private school. §§15–30–3102(7)(a), –3103(1)(c).[1]

So far only one scholarship organization, Big Sky Scholarships, has participated in the program. Big Sky focuses on providing scholarships to families who face financial hardship or have children with disabilities. Scholarship organizations like Big Sky must, among other requirements, maintain an application process for awarding the scholarships; use at least 90% of all donations on scholarship awards; and comply with state reporting and monitoring requirements. §§15–30–3103(1), –3105(1), –3113(1).

A family whose child is awarded a scholarship under the program may use it at any "qualified education provider"— that is, any private school that meets certain accreditation, testing, and safety requirements. See §15–30–3102(7). Virtually every private school in Montana qualifies. Upon receiving a scholarship, the family designates its school of choice, and the scholarship organization sends the scholarship funds directly to the school. §15–30–3104(1). Neither the scholarship organization nor its donors can restrict awards to particular types of schools. See §§15–30–3103(1)(b), –3111(1).

The Montana Legislature allotted $3 million annually to fund the tax credits, beginning in 2016. §15–30–3111(5)(a). If the annual allotment is exhausted, it increases by 10% the following year. *Ibid.* The program is slated to expire in 2023. 2015 Mont. Laws p. 2186, §33.

The Montana Legislature also directed that the program

_____

[1] The Legislature provided the same tax credit to taxpayers who donate to public schools for the purpose of supporting innovative educational programs or curing technology deficiencies at such schools. See Mont. Code Ann. §15–30–3110 (2019).

be administered in accordance with Article X, section 6, of the Montana Constitution, which contains a "no-aid" provision barring government aid to sectarian schools. See Mont. Code Ann. §15–30–3101. In full, that provision states:

> "**Aid prohibited to sectarian schools**. . . . The legislature, counties, cities, towns, school districts, and public corporations shall not make any direct or indirect appropriation or payment from any public fund or monies, or any grant of lands or other property for any sectarian purpose or to aid any church, school, academy, seminary, college, university, or other literary or scientific institution, controlled in whole or in part by any church, sect, or denomination." Mont. Const., Art. X, §6(1).

Shortly after the scholarship program was created, the Montana Department of Revenue promulgated "Rule 1," over the objection of the Montana Attorney General. That administrative rule prohibited families from using scholarships at religious schools. Mont. Admin. Rule §42.4.802(1)(a) (2015). It did so by changing the definition of "qualified education provider" to exclude any school "owned or controlled in whole or in part by any church, religious sect, or denomination." *Ibid.* The Department explained that the Rule was needed to reconcile the scholarship program with the no-aid provision of the Montana Constitution.

The Montana Attorney General disagreed. In a letter to the Department, he advised that the Montana Constitution did not require excluding religious schools from the program, and if it did, it would "very likely" violate the United States Constitution by discriminating against the schools and their students. See Complaint in No. DV–15–1152A (Dist. Ct. Flathead Cty.), Exh. 3, pp. 2, 5–6. The Attorney General is not representing the Department in this case.

### B

This suit was brought by three mothers whose children attend Stillwater Christian School in northwestern Montana. Stillwater is a private Christian school that meets the statutory criteria for "qualified education providers." It serves students in prekindergarten through 12th grade, and petitioners chose the school in large part because it "teaches the same Christian values that [they] teach at home." App. to Pet. for Cert. 152; see *id.*, at 138, 167. The child of one petitioner has already received scholarships from Big Sky, and the other petitioners' children are eligible for scholarships and planned to apply. While in effect, however, Rule 1 blocked petitioners from using scholarship funds for tuition at Stillwater. To overcome that obstacle, petitioners sued the Department of Revenue in Montana state court. Petitioners claimed that Rule 1 conflicted with the statute that created the scholarship program and could not be justified on the ground that it was compelled by the Montana Constitution's no-aid provision. Petitioners further alleged that the Rule discriminated on the basis of their religious views and the religious nature of the school they had chosen for their children.

The trial court enjoined Rule 1, holding that it was based on a mistake of law. The court explained that the Rule was not required by the no-aid provision, because that provision prohibits only "appropriations" that aid religious schools, "not tax credits." *Id.*, at 94.

The injunctive relief freed Big Sky to award scholarships to students regardless of whether they attended a religious or secular school. For the school year beginning in fall 2017, Big Sky received 59 applications and ultimately awarded 44 scholarships of $500 each. The next year, Big Sky received 90 applications and awarded 54 scholarships of $500 each. Several families, most with incomes of $30,000 or less, used the scholarships to send their children to Stillwater Christian.

In December 2018, the Montana Supreme Court reversed the trial court. 393 Mont. 446, 435 P. 3d 603. The Court first addressed the scholarship program unmodified by Rule 1, holding that the program aided religious schools in violation of the no-aid provision of the Montana Constitution. In the Court's view, the no-aid provision "broadly and strictly prohibits aid to sectarian schools." *Id.*, at 459, 435 P. 3d, at 609. The scholarship program provided such aid by using tax credits to "subsidize tuition payments" at private schools that are "religiously affiliated" or "controlled in whole or in part by churches." *Id.*, at 464–467, 435 P. 3d, at 612–613. In that way, the scholarship program flouted the State Constitution's "guarantee to all Montanans that their government will not use state funds to aid religious schools." *Id.*, at 467, 435 P. 3d, at 614.

The Montana Supreme Court went on to hold that the violation of the no-aid provision required invalidating the entire scholarship program. The Court explained that the program provided "no mechanism" for preventing aid from flowing to religious schools, and therefore the scholarship program could not "under *any* circumstance" be construed as consistent with the no-aid provision. *Id.*, at 466–468, 435 P. 3d, at 613–614. As a result, the tax credit is no longer available to support scholarships at either religious or secular private schools.

The Montana Supreme Court acknowledged that "an overly-broad" application of the no-aid provision "could implicate free exercise concerns" and that "there may be a case" where "prohibiting the aid would violate the Free Exercise Clause." *Id.*, at 468, 435 P. 3d, at 614. But, the Court concluded, "this is not one of those cases." *Ibid.*

Finally, the Court agreed with petitioners that the Department had exceeded its authority in promulgating Rule 1. The Court explained that the statute creating the scholarship program had broadly defined qualifying schools to include all private schools, including religious ones, and

the Department lacked authority to "transform" that definition with an administrative rule. *Id.*, at 468–469, 435 P. 3d, at 614–615.

Several Justices wrote separately. All agreed that Rule 1 was invalid, but they expressed differing views on whether the scholarship program was consistent with the Montana and United States Constitutions. Justice Gustafson's concurrence argued that the program violated not only Montana's no-aid provision but also the Federal Establishment and Free Exercise Clauses. *Id.*, at 475–479, 435 P. 3d, at 619–621. Justice Sandefur echoed the majority's conclusion that applying the no-aid provision was consistent with the Free Exercise Clause, and he dismissed the "modern jurisprudence" of that Clause as "unnecessarily complicate[d]" due to "increasingly value-driven hairsplitting and overstretching." *Id.*, at 482–484, 435 P. 3d, at 623–624.

Two Justices dissented. Justice Rice would have held that the scholarship program was permissible under the no-aid provision. He criticized the majority for invalidating the program "*sua sponte*," contending that no party had challenged it under the State Constitution. *Id.*, at 495, 435 P. 3d, at 631. Justice Baker also would have upheld the program. In her view, the no-aid provision did not bar the use of scholarships at religious schools, and free exercise concerns could arise under the Federal Constitution if it did. *Id.*, at 493–494, 435 P. 3d, at 630.

We granted certiorari. 588 U. S. ___ (2019).

## II
### A

The Religion Clauses of the First Amendment provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." We have recognized a "'play in the joints' between what the Establishment Clause permits and the Free Exercise Clause compels." *Trinity Lutheran Church of Columbia,*

*Inc.* v. *Comer*, 582 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 6) (quoting *Locke* v. *Davey*, 540 U. S. 712, 718 (2004)). Here, the parties do not dispute that the scholarship program is permissible under the Establishment Clause. Nor could they. We have repeatedly held that the Establishment Clause is not offended when religious observers and organizations benefit from neutral government programs. See, *e.g.*, *Locke*, 540 U. S., at 719; *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 839 (1995). See also *Trinity Lutheran*, 582 U. S., at \_\_\_ (slip op., at 6) (noting the parties' agreement that the Establishment Clause was not violated by including churches in a playground resurfacing program). Any Establishment Clause objection to the scholarship program here is particularly unavailing because the government support makes its way to religious schools only as a result of Montanans independently choosing to spend their scholarships at such schools. See *Locke*, 540 U. S., at 719; *Zelman* v. *Simmons-Harris*, 536 U. S. 639, 649–653 (2002). The Montana Supreme Court, however, held as a matter of state law that even such indirect government support qualified as "aid" prohibited under the Montana Constitution.

The question for this Court is whether the Free Exercise Clause precluded the Montana Supreme Court from applying Montana's no-aid provision to bar religious schools from the scholarship program. For purposes of answering that question, we accept the Montana Supreme Court's interpretation of state law—including its determination that the scholarship program provided impermissible "aid" within the meaning of the Montana Constitution—and we assess whether excluding religious schools and affected families from that program was consistent with the Federal Constitution.[2]

---------

[2] JUSTICE SOTOMAYOR argues that the Montana Supreme Court "ex-

The Free Exercise Clause, which applies to the States under the Fourteenth Amendment, "protects religious observers against unequal treatment" and against "laws that impose special disabilities on the basis of religious status." *Trinity Lutheran*, 582 U. S., at \_\_\_, \_\_\_ (slip op., at 6, 9) (internal quotation marks and alterations omitted); see *Cantwell* v. *Connecticut*, 310 U. S. 296, 303 (1940). Those "basic principle[s]" have long guided this Court. *Trinity Lutheran*, 582 U. S., at \_\_\_–\_\_\_ (slip op., at 6–9). See, *e.g.*, *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 16 (1947) (a State "cannot exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, *because of their faith, or lack of it*, from receiving the benefits of public welfare legislation"); *Lyng* v. *Northwest Indian Cemetery Protective Assn.*, 485 U. S. 439, 449 (1988) (the Free Exercise Clause protects against laws that "penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens").

Most recently, *Trinity Lutheran* distilled these and other decisions to the same effect into the "unremarkable" conclusion that disqualifying otherwise eligible recipients from a public benefit "solely because of their religious character" imposes "a penalty on the free exercise of religion that triggers the most exacting scrutiny." 582 U. S., at \_\_\_–\_\_\_ (slip op., at 9–10). In *Trinity Lutheran*, Missouri provided grants to help nonprofit organizations pay for playground resurfacing, but a state policy disqualified any organization "owned or controlled by a church, sect, or other religious entity." *Id.*, at \_\_\_ (slip op., at 2). Because of that policy, an

––––––––––

pressly declined to reach any federal issue." *Post*, at 6 (dissenting opinion). Not so. As noted, *supra*, at 5, the Montana Supreme Court recognized that certain applications of the no-aid provision could "violate the Free Exercise Clause." 393 Mont. 446, 468, 435 P. 3d 603, 614 (2018). But the Court expressly concluded that "this is not one of those cases." *Ibid.*

otherwise eligible church-owned preschool was denied a grant to resurface its playground. Missouri's policy discriminated against the Church "simply because of what it is—a church," and so the policy was subject to the "strictest scrutiny," which it failed. *Id.*, at \_\_\_–\_\_\_ (slip op., at 11–15). We acknowledged that the State had not "criminalized" the way in which the Church worshipped or "told the Church that it cannot subscribe to a certain view of the Gospel." *Id.*, at \_\_\_ (slip op., at 11). But the State's discriminatory policy was "odious to our Constitution all the same." *Id.*, at \_\_\_ (slip op., at 15).

Here too Montana's no-aid provision bars religious schools from public benefits solely because of the religious character of the schools. The provision also bars parents who wish to send their children to a religious school from those same benefits, again solely because of the religious character of the school. This is apparent from the plain text. The provision bars aid to any school "controlled in whole or in part by any church, sect, or denomination." Mont. Const., Art. X, §6(1). The provision's title—"Aid prohibited to sectarian schools"—confirms that the provision singles out schools based on their religious character. *Ibid.* And the Montana Supreme Court explained that the provision forbids aid to any school that is "sectarian," "religiously affiliated," or "controlled in whole or in part by churches." 393 Mont., at 464–467, 435 P. 3d, at 612–613. The provision plainly excludes schools from government aid solely because of religious status. See *Trinity Lutheran*, 582 U. S., at \_\_\_–\_\_\_ (slip op., at 9–10).

The Department counters that *Trinity Lutheran* does not govern here because the no-aid provision applies not because of the religious character of the recipients, but because of how the funds would be used—for "religious education." Brief for Respondents 38. In *Trinity Lutheran*, a majority of the Court concluded that the Missouri policy violated the Free Exercise Clause because it discriminated on

the basis of religious status. A plurality declined to address discrimination with respect to "religious uses of funding or other forms of discrimination." 582 U. S., at ___, n. 3 (slip op., at 14, n. 3). The plurality saw no need to consider such concerns because Missouri had expressly discriminated "based on religious identity," *ibid.*, which was enough to invalidate the state policy without addressing how government funds were used.

This case also turns expressly on religious status and not religious use. The Montana Supreme Court applied the no-aid provision solely by reference to religious status. The Court repeatedly explained that the no-aid provision bars aid to "schools controlled in whole or in part by churches," "sectarian schools," and "religiously-affiliated schools." 393 Mont., at 463–467, 435 P. 3d, at 611–613. Applying this provision to the scholarship program, the Montana Supreme Court noted that most of the private schools that would benefit from the program were "religiously affiliated" and "controlled by churches," and the Court ultimately concluded that the scholarship program ran afoul of the Montana Constitution by aiding "schools controlled by churches." *Id.*, at 466–467, 435 P. 3d, at 613–614. The Montana Constitution discriminates based on religious status just like the Missouri policy in *Trinity Lutheran*, which excluded organizations "owned or controlled by a church, sect, or other religious entity." 582 U. S., at ___ (slip op., at 2).

The Department points to some language in the decision below indicating that the no-aid provision has the goal or effect of ensuring that government aid does not end up being used for "sectarian education" or "religious education." 393 Mont., at 460, 466–467, 435 P. 3d, at 609, 613–614. The Department also contrasts what it characterizes as the "completely non-religious" benefit of playground resurfacing in *Trinity Lutheran* with the unrestricted tuition aid at

issue here. Tr. of Oral Arg. 31. General school aid, the Department stresses, could be used for religious ends by some recipients, particularly schools that believe faith should "*permeate*[]" everything they do. Brief for Respondents 39 (quoting *State ex rel. Chambers* v. *School Dist. No. 10*, 155 Mont. 422, 438, 472 P. 2d 1013, 1021 (1970)). See also *post*, at 8, 13 (BREYER, J., dissenting).

Regardless, those considerations were not the Montana Supreme Court's basis for applying the no-aid provision to exclude religious schools; that hinged solely on religious status. Status-based discrimination remains status based even if one of its goals or effects is preventing religious organizations from putting aid to religious uses.

Undeterred by *Trinity Lutheran*, the Montana Supreme Court applied the no-aid provision to hold that religious schools could not benefit from the scholarship program. 393 Mont., at 464–468, 435 P. 3d, at 612–614. So applied, the provision "impose[s] special disabilities on the basis of religious status" and "condition[s] the availability of benefits upon a recipient's willingness to surrender [its] religiously impelled status." *Trinity Lutheran*, 582 U. S., at \_\_\_–\_\_\_ (slip op., at 9–10) (quoting *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 533 (1993), and *McDaniel* v. *Paty*, 435 U. S. 618, 626 (1978) (plurality opinion) (alterations omitted)). To be eligible for government aid under the Montana Constitution, a school must divorce itself from any religious control or affiliation. Placing such a condition on benefits or privileges "inevitably deters or discourages the exercise of First Amendment rights." *Trinity Lutheran*, 582 U. S., at \_\_\_ (slip op., at 11) (quoting *Sherbert* v. *Verner*, 374 U. S. 398, 405 (1963) (alterations omitted)). The Free Exercise Clause protects against even "indirect coercion," and a State "punishe[s] the free exercise of religion" by disqualifying the religious from government aid as Montana did here. *Trinity Lutheran*, 582 U. S., at \_\_\_–\_\_\_ (slip op., at 10–11) (internal quotation marks omitted). Such status-

based discrimination is subject to "the strictest scrutiny." *Id.*, at ___ (slip op., at 11).

None of this is meant to suggest that we agree with the Department, Brief for Respondents 36–40, that some lesser degree of scrutiny applies to discrimination against religious uses of government aid. See *Lukumi*, 508 U. S., at 546 (striking down law designed to ban religious practice involving alleged animal cruelty, explaining that a law "target[ing] religious conduct for distinctive treatment or advanc[ing] legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases"). Some Members of the Court, moreover, have questioned whether there is a meaningful distinction between discrimination based on use or conduct and that based on status. See *Trinity Lutheran*, 582 U. S., at ___–___ (slip op., at 1–2) (GORSUCH, J., joined by THOMAS, J., concurring in part) (citing, *e.g.*, *Lukumi*, 508 U. S. 520, and *Thomas* v. *Review Bd. of Ind. Employment Security Div.*, 450 U. S. 707 (1981)). We acknowledge the point but need not examine it here. It is enough in this case to conclude that strict scrutiny applies under *Trinity Lutheran* because Montana's no-aid provision discriminates based on religious status.

B

Seeking to avoid *Trinity Lutheran*, the Department contends that this case is instead governed by *Locke* v. *Davey*, 540 U. S. 712 (2004). See also *post*, at 5 (BREYER, J., dissenting); *post*, at 9 (SOTOMAYOR, J., dissenting). *Locke* also involved a scholarship program. The State of Washington provided scholarships paid out of the State's general fund to help students pursuing postsecondary education. The scholarships could be used at accredited religious and non-religious schools alike, but Washington prohibited students from using the scholarships to pursue devotional theology degrees, which prepared students for a calling as clergy.

This prohibition prevented Davey from using his scholarship to obtain a degree that would have enabled him to become a pastor. We held that Washington had not violated the Free Exercise Clause.

*Locke* differs from this case in two critical ways. First, *Locke* explained that Washington had "merely chosen not to fund a distinct category of instruction": the "essentially religious endeavor" of training a minister "to lead a congregation." *Id.*, at 721. Thus, Davey "was denied a scholarship because of what he proposed *to do*—use the funds to prepare for the ministry." *Trinity Lutheran*, 582 U. S., at \_\_\_ (slip op., at 12). Apart from that narrow restriction, Washington's program allowed scholarships to be used at "pervasively religious schools" that incorporated religious instruction throughout their classes. *Locke*, 540 U. S., at 724–725. By contrast, Montana's Constitution does not zero in on any particular "essentially religious" course of instruction at a religious school. Rather, as we have explained, the no-aid provision bars all aid to a religious school "simply because of what it is," putting the school to a choice between being religious or receiving government benefits. *Trinity Lutheran*, 582 U. S., at \_\_\_ (slip op., at 12). At the same time, the provision puts families to a choice between sending their children to a religious school or receiving such benefits.

Second, *Locke* invoked a "historic and substantial" state interest in not funding the training of clergy, 540 U. S., at 725, explaining that "opposition to . . . funding 'to support church leaders' lay at the historic core of the Religion Clauses," *Trinity Lutheran*, 582 U. S., at \_\_\_ (slip op., at 13) (quoting *Locke*, 540 U. S., at 722). As evidence of that tradition, the Court in *Locke* emphasized that the propriety of state-supported clergy was a central subject of founding-era debates, and that most state constitutions from that era prohibited the expenditure of tax dollars to support the clergy. See *id.*, at 722–723.

But no comparable "historic and substantial" tradition supports Montana's decision to disqualify religious schools from government aid. In the founding era and the early 19th century, governments provided financial support to private schools, including denominational ones. "Far from prohibiting such support, the early state constitutions and statutes actively encouraged this policy." L. Jorgenson, The State and the Non-Public School, 1825–1925, p. 4 (1987); *e.g.,* R. Gabel, Public Funds for Church and Private Schools 210, 217–218, 221, 241–243 (1937); C. Kaestle, Pillars of the Republic: Common Schools and American Society, 1760–1860, pp. 166–167 (1983). Local governments provided grants to private schools, including religious ones, for the education of the poor. M. McConnell, et al., Religion and the Constitution 318–319 (4th ed. 2016). Even States with bans on government-supported clergy, such as New Jersey, Pennsylvania, and Georgia, provided various forms of aid to religious schools. See Kaestle, *supra*, at 166–167; Gabel, *supra*, at 215–218, 241–245, 372–374; cf. *Locke*, 540 U. S., at 723. Early federal aid (often land grants) went to religious schools. McConnell, *supra*, at 319. Congress provided support to denominational schools in the District of Columbia until 1848, *ibid.*, and Congress paid churches to run schools for American Indians through the end of the 19th century, see *Quick Bear* v. *Leupp*, 210 U. S. 50, 78 (1908); Gabel, *supra*, at 521–523. After the Civil War, Congress spent large sums on education for emancipated freedmen, often by supporting denominational schools in the South through the Freedmen's Bureau. McConnell, *supra*, at 323.[3]

_____

[3] JUSTICE BREYER sees "no meaningful difference" between concerns animating bans on support for clergy and bans on support for religious schools. *Post*, at 8–10. But evidently early American governments did. See *supra,* at 14. JUSTICE BREYER contests particular examples but acknowledges that some bans on clergy support did not bar certain "sponsorship" of religious schools. *Post*, at 10. And, central to the issue here,

The Department argues that a tradition *against* state support for religious schools arose in the second half of the 19th century, as more than 30 States—including Montana—adopted no-aid provisions. See Brief for Respondents 40–42 and App. D. Such a development, of course, cannot by itself establish an early American tradition. JUSTICE SOTOMAYOR questions our reliance on aid provided during the same era by the Freedmen's Bureau, *post*, at 10 (dissenting opinion), but we see no inconsistency in recognizing that such evidence may reinforce an early practice but cannot create one. In addition, many of the no-aid provisions belong to a more checkered tradition shared with the Blaine Amendment of the 1870s. That proposal—which Congress nearly passed—would have added to the Federal Constitution a provision similar to the state no-aid provisions, prohibiting States from aiding "sectarian" schools. See *Mitchell* v. *Helms*, 530 U. S. 793, 828 (2000) (plurality opinion). "[I]t was an open secret that 'sectarian' was code for 'Catholic.'" *Ibid.*; see Jorgenson, *supra*, at 70. The Blaine Amendment was "born of bigotry" and "arose at a time of pervasive hostility to the Catholic Church and to Catholics

————————

he certainly does not identify a consistent early tradition, of the sort invoked in *Locke*, *against* support for religious schools. Virginia's opposition to establishing university theology professorships and chartering theological seminaries, see *ibid.*, do not fit the bill. Buckley, After Disestablishment: Thomas Jefferson's Wall of Separation in Antebellum Virginia, 61 J. So. Hist. 445, 452–453 (1995). JUSTICE BREYER also invokes Madison's objections to the Virginia Assessment Bill, *post*, at 8–9, but Madison objected in part because the Bill provided special support to certain churches and clergy, thereby "violat[ing] equality by subjecting some to peculiar burdens." Memorial and Remonstrance Against Religious Assessments, Art. 4, reprinted in *Everson*, 330 U. S., at 66 (appendix to dissenting opinion of Rutledge, J.); see V. Muñoz, God and the Founders: Madison, Washington, and Jefferson 21–22, 27 (2009). It is far from clear that the same objections extend to programs that provide equal support to all private primary and secondary schools. If anything, excluding religious schools from such programs would appear to impose the "peculiar burdens" feared by Madison.

in general"; many of its state counterparts have a similarly "shameful pedigree." *Mitchell*, 530 U. S., at 828–829 (plurality opinion); see Jorgenson, *supra*, at 69–70, 216; Jeffries & Ryan, A Political History of the Establishment Clause, 100 Mich. L. Rev. 279, 301–305 (2001). The no-aid provisions of the 19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause.

The Department argues that several States have rejected referendums to overturn or limit their no-aid provisions, and that Montana even re-adopted its own in the 1970s, for reasons unrelated to anti-Catholic bigotry. See Brief for Respondents 20, 42. But, on the other side of the ledger, many States today—including those with no-aid provisions—provide support to religious schools through vouchers, scholarships, tax credits, and other measures. See Brief for Oklahoma et al. as *Amici Curiae* 29–31, 33–35; Brief for Petitioners 5. According to petitioners, 20 of 37 States with no-aid provisions allow religious options in publicly funded scholarship programs, and almost all allow religious options in tax credit programs. Reply Brief 22, n. 9.

All to say, we agree with the Department that the historical record is "complex." Brief for Respondents 41. And it is true that governments over time have taken a variety of approaches to religious schools. But it is clear that there is no "historic and substantial" tradition against aiding such schools comparable to the tradition against state-supported clergy invoked by *Locke*.

C

Two dissenters would chart new courses. JUSTICE SOTOMAYOR would grant the government "some room" to "single . . . out" religious entities "for exclusion," based on what she views as "the interests embodied in the Religion Clauses." *Post,* at 8, 9 (quoting *Trinity Lutheran*, 582 U. S., at ___, ___ (SOTOMAYOR, J., dissenting) (slip op., at 8, 9)).

JUSTICE BREYER, building on his solo opinion in *Trinity Lutheran*, would adopt a "flexible, context-specific approach" that "may well vary" from case to case. *Post*, at 14, 16; see *Trinity Lutheran*, 582 U. S., at \_\_\_ (BREYER, J., concurring in judgment). As best we can tell, courts applying this approach would contemplate the particular benefit and restriction at issue and discern their relationship to religion and society, taking into account "context and consequences measured in light of [the] purposes" of the Religion Clauses. *Post*, at 16–17, 19 (quoting *Van Orden* v. *Perry*, 545 U. S. 677, 700 (2005) (BREYER, J., concurring in judgment)). What is clear is that JUSTICE BREYER would afford much freer rein to judges than our current regime, arguing that "there is 'no test-related substitute for the exercise of legal judgment.'" *Post*, at 19 (quoting *Van Orden*, 545 U. S., at 700 (opinion of BREYER, J.)).

The simplest response is that these dissents follow from prior separate writings, not from the Court's decision in *Trinity Lutheran* or the decades of precedent on which it relied. These precedents have "repeatedly confirmed" the straightforward rule that we apply today: When otherwise eligible recipients are disqualified from a public benefit "solely because of their religious character," we must apply strict scrutiny. *Trinity Lutheran*, 582 U. S., at \_\_\_–\_\_\_ (slip op., at 6–10). This rule against express religious discrimination is no "doctrinal innovation." *Post*, at 13 (opinion of BREYER, J.). Far from it. As *Trinity Lutheran* explained, the rule is "unremarkable in light of our prior decisions." 582 U. S., at \_\_\_ (slip op., at 10).

For innovation, one must look to the dissents. Their "room[y]" or "flexible" approaches to discrimination against religious organizations and observers would mark a significant departure from our free exercise precedents. The protections of the Free Exercise Clause do not depend on a "judgment-by-judgment analysis" regarding whether discrimination against religious adherents would somehow

serve ill-defined interests.  Cf. *Medellín* v. *Texas*, 552 U. S. 491, 514 (2008).

D

Because the Montana Supreme Court applied the no-aid provision to discriminate against schools and parents based on the religious character of the school, the "strictest scrutiny" is required.  *Supra*, at 9, 12 (quoting *Trinity Lutheran*, 582 U. S., at ___ (slip op., at 11)).  That "stringent standard," *id.,* at ___ (slip op., at 14), is not "watered down but really means what it says," *Lukumi*, 508 U. S., at 546 (internal quotation marks and alterations omitted).  To satisfy it, government action "must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests."  *Ibid.* (quoting *McDaniel*, 435 U. S., at 628).

The Montana Supreme Court asserted that the no-aid provision serves Montana's interest in separating church and State "more fiercely" than the Federal Constitution. 393 Mont., at 467, 435 P. 3d, at 614.  But "that interest cannot qualify as compelling" in the face of the infringement of free exercise here.  *Trinity Lutheran*, 582 U. S., at ___ (slip op., at 14).  A State's interest "in achieving greater separation of church and State than is already ensured under the Establishment Clause . . . is limited by the Free Exercise Clause."  *Ibid.* (quoting *Widmar* v. *Vincent*, 454 U. S. 263, 276 (1981)).

The Department, for its part, asserts that the no-aid provision actually *promotes* religious freedom.  In the Department's view, the no-aid provision protects the religious liberty of taxpayers by ensuring that their taxes are not directed to religious organizations, and it safeguards the freedom of religious organizations by keeping the government out of their operations. See Brief for Respondents 17–23.  An infringement of First Amendment rights, however, cannot be justified by a State's alternative view that the infringement advances religious liberty.  Our federal system

prizes state experimentation, but not "state experimentation in the suppression of free speech," and the same goes for the free exercise of religion. *Boy Scouts of America* v. *Dale*, 530 U. S. 640, 660 (2000).

Furthermore, we do not see how the no-aid provision promotes religious freedom. As noted, this Court has repeatedly upheld government programs that spend taxpayer funds on equal aid to religious observers and organizations, particularly when the link between government and religion is attenuated by private choices. A school, concerned about government involvement with its religious activities, might reasonably decide for itself not to participate in a government program. But we doubt that the school's liberty is enhanced by eliminating any option to participate in the first place.

The Department's argument is especially unconvincing because the infringement of religious liberty here broadly affects both religious schools and adherents. Montana's no-aid provision imposes a categorical ban—"broadly and strictly" prohibiting "*any* type of aid" to religious schools. 393 Mont., at 462–463, 435 P. 3d, at 611. This prohibition is far more sweeping than the policy in *Trinity Lutheran*, which barred churches from one narrow program for playground resurfacing—causing "in all likelihood" only "a few extra scraped knees." 582 U. S., at \_\_\_ (slip op., at 15).

And the prohibition before us today burdens not only religious schools but also the families whose children attend or hope to attend them. Drawing on "enduring American tradition," we have long recognized the rights of parents to direct "the religious upbringing" of their children. *Wisconsin* v. *Yoder*, 406 U. S. 205, 213–214, 232 (1972). Many parents exercise that right by sending their children to religious schools, a choice protected by the Constitution. See *Pierce* v. *Society of Sisters*, 268 U. S. 510, 534–535 (1925). But the no-aid provision penalizes that decision by cutting families off from otherwise available benefits if they choose

a religious private school rather than a secular one, and for no other reason.

The Department also suggests that the no-aid provision advances Montana's interests in public education. According to the Department, the no-aid provision safeguards the public school system by ensuring that government support is not diverted to private schools. See Brief for Respondents 19, 25. But, under that framing, the no-aid provision is fatally underinclusive because its "proffered objectives are not pursued with respect to analogous nonreligious conduct." *Lukumi*, 508 U. S., at 546. On the Department's view, an interest in public education is undermined by diverting government support to *any* private school, yet the no-aid provision bars aid only to *religious* ones. A law does not advance "an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Id.*, at 547 (internal quotation marks and alterations omitted). Montana's interest in public education cannot justify a no-aid provision that requires only religious private schools to "bear [its] weight." *Ibid.*

A State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious.

## III

The Department argues that, at the end of the day, there is no free exercise violation here because the Montana Supreme Court ultimately eliminated the scholarship program altogether. According to the Department, now that there is no program, religious schools and adherents cannot complain that they are excluded from any generally available benefit.

Two dissenters agree. JUSTICE GINSBURG reports that the State of Montana simply chose to "put all private school parents in the same boat" by invalidating the scholarship program, *post*, at 5–6, and JUSTICE SOTOMAYOR describes

the decision below as resting on state law grounds having nothing to do with the federal Free Exercise Clause, see *post*, at 1, 6.

The descriptions are not accurate. The Montana Legislature created the scholarship program; the Legislature never chose to end it, for policy or other reasons. The program was eliminated by a court, and not based on some innocuous principle of state law. Rather, the Montana Supreme Court invalidated the program pursuant to a state law provision that expressly discriminates on the basis of religious status. The Court applied that provision to hold that religious schools were barred from participating in the program. Then, seeing no other "mechanism" to make absolutely sure that religious schools received no aid, the court chose to invalidate the entire program. 393 Mont., at 466–468, 435 P. 3d, at 613–614.

The final step in this line of reasoning eliminated the program, to the detriment of religious and non-religious schools alike. But the Court's error of federal law occurred at the beginning. When the Court was called upon to apply a state law no-aid provision to exclude religious schools from the program, it was obligated by the Federal Constitution to reject the invitation. Had the Court recognized that this was, indeed, "one of those cases" in which application of the no-aid provision "would violate the Free Exercise Clause," *id.*, at 468, 435 P. 3d, at 614, the Court would not have proceeded to find a violation of that provision. And, in the absence of such a state law violation, the Court would have had no basis for terminating the program. Because the elimination of the program flowed directly from the Montana Supreme Court's failure to follow the dictates of federal law, it cannot be defended as a neutral policy decision, or as resting on adequate and independent state law

grounds.[4]

The Supremacy Clause provides that "the Judges in every State shall be bound" by the Federal Constitution, "any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. 2. "[T]his Clause creates a rule of decision" directing state courts that they "must not give effect to state laws that conflict with federal law[]." *Armstrong* v. *Exceptional Child Center, Inc.*, 575 U. S. 320, 324 (2015). Given the conflict between the Free Exercise Clause and the application of the no-aid provision here, the Montana Supreme Court should have "disregard[ed]" the no-aid provision and decided this case "conformably to the [C]onstitution" of the United States. *Marbury* v. *Madison*, 1 Cranch 137, 178 (1803). That "*supreme* law of the land" condemns discrimination against religious schools and the families whose children attend them. *Id.*, at 180. They are "member[s] of the community too," and their exclusion from the scholarship program here is "odious to our Constitution" and "cannot stand." *Trinity Lutheran*, 582 U. S., at ___, ___ (slip op., at 11, 15).[5]

\*    \*    \*

The judgment of the Montana Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

————————

[4] JUSTICE SOTOMAYOR worries that, in light of our decision, the Montana Supreme Court must "order the State to recreate" a scholarship program that "no longer exists." *Post*, at 6 (dissenting opinion). But it was the Montana Supreme Court that eliminated the program, in the decision below, which remains under review. Our reversal of that decision simply restores the status quo established by the Montana Legislature before the Court's error of federal law. We do not consider any alterations the Legislature may choose to make in the future.

[5] In light of this holding, we do not address petitioners' claims that the no-aid provision, as applied, violates the Equal Protection Clause or the Establishment Clause.

# SUPREME COURT OF THE UNITED STATES

No. 18–1195

KENDRA ESPINOZA, ET AL., PETITIONERS *v.*
MONTANA DEPARTMENT OF REVENUE, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
MONTANA

[June 30, 2020]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, concurring.

The Court correctly concludes that Montana's no-aid provision expressly discriminates against religion in violation of the Free Exercise Clause. And it properly provides relief to Montana religious schools and the petitioners who wish to use Montana's scholarship program to send their children to such schools. I write separately to explain how this Court's interpretation of the Establishment Clause continues to hamper free exercise rights. Until we correct course on that interpretation, individuals will continue to face needless obstacles in their attempts to vindicate their religious freedom.

## I
### A

This case involves the Free Exercise Clause, not the Establishment Clause. But as in all cases involving a state actor, the modern understanding of the Establishment Clause is a "brooding omnipresence," *Southern Pacific Co.* v. *Jensen*, 244 U. S. 205, 222 (1917) (Holmes, J., dissenting), ever ready to be used to justify the government's infringement on religious freedom. Under the modern, but erroneous, view of the Establishment Clause, the government must treat all religions equally and treat religion equally to

nonreligion. As this Court stated in its first case applying the Establishment Clause to the States, the government cannot "pass laws which aid one religion, aid all religions, or prefer one religion over another." *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 15 (1947); see also *post*, at 3 (BREYER, J., dissenting). This "equality principle," the theory goes, prohibits the government from expressing any preference for religion—or even permitting any signs of religion in the governmental realm. Thus, when a plaintiff brings a free exercise claim, the government may defend its law, as Montana did here, on the ground that the law's restrictions are *required* to prevent it from "establishing" religion.

This understanding of the Establishment Clause is unmoored from the original meaning of the First Amendment. As I have explained in previous cases, at the founding, the Clause served only to "protec[t] States, and by extension their citizens, from the imposition of an established religion by the *Federal* Government." *Zelman* v. *Simmons-Harris*, 536 U. S. 639, 678 (2002) (THOMAS, J., concurring) (emphasis added); see also, *e.g.*, *Town of Greece* v. *Galloway*, 572 U. S. 565, 604–607 (2014) (THOMAS, J., concurring in part and concurring in judgment); *Elk Grove Unified School Dist.* v. *Newdow*, 542 U. S. 1, 49–50 (2004) (THOMAS, J., concurring in judgment). Under this view, the Clause resists incorporation against the States. See *Town of Greece*, 572 U. S., at 604 (opinion of THOMAS, J.).

There is mixed historical evidence concerning whether the Establishment Clause was understood as an individual right at the time of the Fourteenth Amendment's ratification. *Id.*, at 607–608. Even assuming that the Clause creates a right and that such a right could be incorporated, however, it would only protect against an "establishment" of religion as understood at the founding, *i.e.*, "'coercion of religious orthodoxy and of financial support by force of law and threat of penalty.'" *Id.*, at 608 (quoting *Lee* v. *Weisman*,

505 U. S. 577, 640 (1992) (Scalia, J., dissenting); emphasis deleted); *American Legion* v. *American Humanist Assn.*, 588 U. S. \_\_\_, \_\_\_ (2019) (Thomas, J., concurring in judgment) (slip op., at 3); see also McConnell, Establishment and Disestablishment at the Founding, Part I: Establishment of Religion, 44 Wm. & Mary L. Rev. 2105, 2131–2181 (2003); McConnell, Coercion: The Lost Element of Establishment, 27 Wm. & Mary L. Rev. 933, 936–939 (1986).[1]

Thus, the modern view, which presumes that States must remain both completely separate from and virtually silent on matters of religion to comply with the Establishment Clause, is fundamentally incorrect. Properly understood, the Establishment Clause does not prohibit States from favoring religion. They can legislate as they wish, subject only to the limitations in the State and Federal Constitutions. See Muñoz, The Original Meaning of the Establishment Clause and the Impossibility of Its Incorporation, 8 U. Pa. J. Const. L. 585, 632 (2006).

## B

I have previously made these points in Establishment Clause cases to show that the Clause likely has no application to the States or, if it is capable of incorporation, that the Court employs a far broader test than the Clause's original meaning. See, *e.g.*, *American Legion*, 588 U. S., at \_\_\_ (opinion concurring in judgment) (slip op., at 1); *Town of Greece*, 572 U. S., at 604 (opinion concurring in part and concurring in judgment). But the Court's wayward approach to the Establishment Clause also impacts its free exercise jurisprudence. Specifically, its overly expansive

---

[1] A party wishing to expand the scope of the Establishment Clause beyond its meaning at the founding carries the burden of demonstrating that this broader reading is historically sound. *Town of Greece* v. *Galloway*, 572 U. S. 565, 607–608 (2014) (Thomas, J., concurring in part and concurring in judgment).

understanding of the former Clause has led to a correspondingly cramped interpretation of the latter.

Under this Court's current approach, state and local governments may rely on the Establishment Clause to justify policies that others wish to challenge as violations of the Free Exercise Clause. Once the government demonstrates that its policy is *required* for compliance with the Constitution, any claim that the policy infringes on free exercise cannot survive. A few examples suffice to illustrate this practice.

Of most relevance to this case is *Locke* v. *Davey*, 540 U. S. 712 (2004), which Montana principally relies on to justify its discriminatory law. In *Locke*, the Court held that prohibiting a student from using a generally available state scholarship to pursue a degree in devotional theology did not violate the student's free exercise rights. This was so, the Court said, in part because it furthered the State's "antiestablishment interests" in avoiding the education of religious ministers. *Id.*, at 722. But no antiestablishment interests, properly understood, were at issue in *Locke*. The State neither coerced students to study devotional theology nor conscripted taxpayers into supporting any form of orthodoxy. Thus, as I have explained, *Locke* incorrectly interpreted the Establishment Clause and should not impact free exercise challenges. *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. ___, ___ (2017) (THOMAS, J., concurring). Yet, as Montana's proffered justification for its law shows, governments continue to rely on *Locke*'s improper understanding of "antiestablishment interests" to defend against free exercise challenges. See Brief for State of Colorado et al. as *Amici Curiae* 3, 10–12 (arguing that *Locke* justifies the 38 state constitutional provisions that are similar to Montana's); see also *Trinity Lutheran Church of Columbia, Inc.* v. *Pauley*, 788 F. 3d 779, 785 (CA8 2015), rev'd and remanded, 582 U. S. ___; *Eulitt* v. *Maine*, 386

F. 3d 344, 354 (CA1 2004); *post*, at 5–8 (BREYER, J., dissenting); *post*, at 9–10 (SOTOMAYOR, J., dissenting).

The Court has also repeatedly stated that a government has a compelling interest in avoiding an Establishment Clause violation altogether, which "may justify" abridging other First Amendment freedoms. See *Good News Club* v. *Milford Central School*, 533 U. S. 98, 112 (2001); *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384, 394 (1993); *Widmar* v. *Vincent*, 454 U. S. 263, 271 (1981). Unsurprisingly, governmental employers have relied on these pronouncements to defeat challenges from employees who alleged violations of their First Amendment rights. See, *e.g.*, *Berry* v. *Department of Social Servs.*, 447 F. 3d 642, 650–651 (CA9 2006); *Knight* v. *Connecticut Dept. of Public Health*, 275 F. 3d 156, 166 (CA2 2001); *Marchi* v. *Board of Cooperative Ed. Servs. of Albany*, 173 F. 3d 469, 475 (CA2 1999).

Finally, this Court's infamous test in *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971), has sometimes been understood to prohibit governmental practices that have the effect of endorsing religion. See *Lynch* v. *Donnelly*, 465 U. S. 668, 692 (1984) (O'Connor, J., concurring). This, too, presupposes that the Establishment Clause prohibits the government from favoring religion or taking steps to promote it. But as described *supra*, at 2–3, the Establishment Clause does nothing of the sort. The concern with avoiding endorsement has nevertheless been used to prohibit voluntary practices that potentially implicate free exercise rights, with courts and governments going so far as to make the "remarkable" suggestion "that even while off duty, a teacher or coach cannot engage in any outward manifestation of religious faith." *Kennedy* v. *Bremerton School Dist.*, 586 U. S. \_\_\_, \_\_\_ (2019) (slip op., at 5) (ALITO, J., concurring in denial of certiorari); see *Santa Fe Independent School Dist.* v. *Doe*, 530 U. S. 290, 308 (2000) (voluntary decision to begin football games with

a prayer violated the Establishment Clause); see also *Kennedy* v. *Bremerton School Dist.*, 869 F. 3d 813, 831 (CA9 2017) (M. Smith, J., concurring) (coach's decision to lead voluntary prayer after football games); *Walz* v. *Egg Harbor Twp. Bd. of Ed.*, 342 F. 3d 271, 280 (CA3 2003) (student's decision to distribute small gifts with religious messages to classmates).

## II

The Court's current understanding of the Establishment Clause actually thwarts, rather than promotes, equal treatment of religion. Under a proper understanding of the Establishment Clause, robust and lively debate about the role of religion in government is permitted, even encouraged, at the state and local level. The Court's distorted view of the Establishment Clause, however, removes the entire subject of religion from the realm of permissible governmental activity, instead mandating strict separation.

This interpretation of the Establishment Clause operates as a type of content-based restriction on the government. The Court has interpreted the Free Speech Clause to prohibit content-based restrictions because they "value some forms of speech over others," *City of Ladue* v. *Gilleo*, 512 U. S. 43, 60 (1994) (O'Connor, J., concurring), thus tending to "tilt public debate in a preferred direction," *Sorrell* v. *IMS Health Inc.*, 564 U. S. 552, 578–579 (2011). The content-based restriction imposed by this Court's Establishment Clause jurisprudence operates no differently. It communicates a message that religion is dangerous and in need of policing, which in turn has the effect of tilting society in favor of devaluing religion.

Historical evidence suggests that many advocates for this separationist view were originally motivated by hostility toward certain disfavored religions. See P. Hamburger, Separation of Church and State 391–454 (2002). And this Court's adoption of a separationist interpretation has itself

sometimes bordered on religious hostility. Justice Black, well known for his role in formulating the Court's modern Establishment Clause jurisprudence, once described Catholic petitioners as "powerful sectarian religious propagandists" "looking toward complete domination and supremacy" of their "preferences and prejudices." *Board of Ed. of Central School Dist. No. 1* v. *Allen*, 392 U. S. 236, 251 (1968) (dissenting opinion). Other Members of the Court have characterized religions as "divisive forces." *Edwards* v. *Aguillard*, 482 U. S. 578, 584 (1987) (internal quotation marks omitted); *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens*, 496 U. S. 226, 287 (1990) (Stevens, J., dissenting) (internal quotation marks omitted); *Illinois ex rel. McCollum* v. *Board of Ed. of School Dist. No. 71, Champaign Cty.*, 333 U. S. 203, 231 (1948) (Frankfurter, J., concurring). And the Court once described a statute permitting employees to request accommodations to avoid work on the Sabbath as "arm[ing]" religious employees with the "absolute and unqualified right" to pursue their religion "over all other . . . interests." *Estate of Thornton* v. *Caldor, Inc.*, 472 U. S. 703, 709–711 (1985). The siren song of religion is apparently so strong that we once held that public school teachers cannot provide assistance at parochial schools, lest they "subtly (or overtly) conform their instruction to the environment in which they teach." *School Dist. of Grand Rapids* v. *Ball*, 473 U. S. 373, 388 (1985), overruled by *Agostini* v. *Felton*, 521 U. S. 203, 235 (1997). In the Court's view, "[t]he 'atmosphere' of a Catholic school ha[d] such power to influence the unsuspecting mind that it may move even public school . . . specialists to 'conform'— though their only contact with the school is to walk down its halls." McConnell, Religious Freedom at a Crossroads, 59 U. Chi. L. Rev. 115, 122 (1992).

Although such hostility may not be overtly expressed by the Court any longer, manifestations of this "trendy disdain for deep religious conviction" assuredly live on. *Locke*, 540

U. S., at 733 (Scalia, J., dissenting).  They are evident in the fact that, unlike other constitutional rights, the mere exposure to religion can render an "'offended observer'" sufficiently injured to bring suit against the government, *American Legion*, 588 U. S., at ___ (GORSUCH, J., concurring in judgment) (slip op., at 2), even if he has not been coerced in any way to participate in a religious practice, *Lee*, 505 U. S., at 584; *Engel* v. *Vitale*, 370 U. S. 421, 430 (1962).[2]  We also see them in the special privilege of taxpayer standing in Establishment Clause challenges, even though such suits directly contravene Article III's restrictions on standing.  See *Hein* v. *Freedom From Religion Foundation, Inc.*, 551 U. S. 587, 618 (2007) (Scalia, J., concurring in judgment); see also *Bowen* v. *Kendrick*, 487 U. S. 589, 618–620 (1988); *Flast* v. *Cohen*, 392 U. S. 83, 102–104 (1968).  And they persist in the repeated denigration of those who continue to adhere to traditional moral standards, as well as laws even remotely influenced by such standards, as outmoded at best and bigoted at worst.  See *Masterpiece Cakeshop, Ltd.* v. *Colorado Civil Rights Comm'n*, 584 U. S. ___, ___ (2018) (THOMAS, J., concurring in part and concurring in judgment) (slip op., at 14); *Obergefell* v. *Hodges*, 576 U. S. 644, 712 (2015) (ROBERTS, C. J., dissenting).  So long as this hostility remains, fostered by our distorted understanding of the Establishment Clause, free exercise rights will continue to suffer.

\*     \*     \*

As I have recently explained, this Court has an unfortunate tendency to prefer certain constitutional rights over others.  See *United States* v. *Sineneng-Smith*, *ante*, at 6

---

[2] This stands in striking contrast to the Court's view in the free speech context that "the burden normally falls upon the viewer" to avoid offense "simply by averting his eyes."  *Hill* v. *Colorado*, 530 U. S. 703, 753, n. 3 (2000) (Scalia, J., dissenting) (quoting *Erznoznik* v. *Jacksonville*, 422 U. S. 205, 210–211 (1975); quotation altered)).

(THOMAS, J., concurring).  The Free Exercise Clause, although enshrined explicitly in the Constitution, rests on the lowest rung of the Court's ladder of rights, and precariously so at that.  Returning the Establishment Clause to its proper scope will not completely rectify the Court's disparate treatment of constitutional rights, but it will go a long way toward allowing free exercise of religion to flourish as the Framers intended.  I look forward to the day when the Court takes up this task in earnest.

# SUPREME COURT OF THE UNITED STATES

───────────

No. 18–1195

───────────

KENDRA ESPINOZA, ET AL., PETITIONERS *v.*
MONTANA DEPARTMENT OF REVENUE, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
MONTANA

[June 30, 2020]

JUSTICE ALITO, concurring.

I join the opinion of the Court in full. The basis of the decision below was a Montana constitutional provision that, according to the Montana Supreme Court, forbids parents from participating in a publicly funded scholarship program simply because they send their children to religious schools. Regardless of the motivation for this provision or its predecessor, its application here violates the Free Exercise Clause.

Nevertheless, the provision's origin is relevant under the decision we issued earlier this Term in *Ramos* v. *Louisiana*, 590 U. S. \_\_\_ (2020). The question in *Ramos* was whether Louisiana and Oregon laws allowing non-unanimous jury verdicts in criminal trials violated the Sixth Amendment. The Court held that they did, emphasizing that the States originally adopted those laws for racially discriminatory reasons. See *id.*, at \_\_\_–\_\_\_ (slip op., at 1–3). The role of the Ku Klux Klan was highlighted. See *ibid.*; see also *id.*, at \_\_\_ (SOTOMAYOR, J., concurring in part) (slip op., at 4); *id.*, at \_\_\_ (KAVANAUGH, J., concurring in part) (slip op., at 12).

I argued in dissent that this original motivation, though deplorable, had no bearing on the laws' constitutionality because such laws can be adopted for non-discriminatory reasons, and "both States readopted their rules under different

circumstances in later years." *Id.*, at ___ (slip op., at 3). But I lost, and *Ramos* is now precedent. If the original motivation for the laws mattered there, it certainly matters here.

The origin of Montana's "no-aid" provision, Mont. Const., Art. X, §6(1) (1972), is emphasized in petitioners' brief and in the briefs of numerous supporting *amici.* See Brief for Petitioners 31–45; Brief for United States as *Amicus Curiae* 1–2, 25; Brief for Center for Constitutional Jurisprudence as *Amicus Curiae* 10–12; Brief for Pioneer Institute, Inc., as *Amicus Curiae* 5–17; Brief for Cato Institute as *Amicus Curiae* 2; Brief for State of Oklahoma et al. as *Amici Curiae* 16; Brief for Montana Catholic School Parents et al. as *Amici Curiae* 21–25; Brief for Senator Steve Daines et al. as *Amici Curiae* 1–27 (Sen. Daines Brief); Brief for Becket Fund for Religious Liberty as *Amicus Curiae* 4–20 (Becket Fund Brief); Brief for the Rutherford Institute as *Amicus Curiae* 2–10; Brief for Georgia Goal Scholarship Program, Inc., as *Amicus Curiae* 1–5, 16–21; Brief for Liberty Justice Center et al. as *Amici Curiae* 16–17; Brief for Alliance for Choice in Education as *Amicus Curiae* 4–8; Brief for Independence Institute as *Amicus Curiae* 4–26 (Independence Institute Brief); Brief for Jewish Coalition for Religious Liberty as *Amicus Curiae* 1–5; Brief for Rusty Bowers et al. as *Amici Curiae* 8–9; Brief for Center for Education Reform et al. as *Amici Curiae* 21–27 (CER Brief); Brief for Montana Family Foundation as *Amicus Curiae* 9–13; Brief for Arizona Christian School Tuition Organization et al. as *Amici Curiae* 14–22; Brief for Justice and Freedom Fund et al. as *Amici Curiae* 22–23; Brief for 131 Current and Former State Legislators as *Amici Curiae* 2–10.

These briefs, most of which were not filed by organizations affiliated with the Catholic Church, point out that Montana's provision was modeled on the failed Blaine Amendment to the Constitution of the United States. Named after House Speaker James Blaine, the Congressman who introduced it in 1875, the amendment was

prompted by virulent prejudice against immigrants, particularly Catholic immigrants. In effect, the amendment would have "bar[red] any aid" to Catholic and other "sectarian" schools. *Mitchell* v. *Helms*, 530 U. S. 793, 828 (2000) (plurality opinion). As noted in a publication from the United States Commission on Civil Rights, a prominent supporter of this ban was the Ku Klux Klan.[1]

The Blaine Amendment was narrowly defeated, passing in the House but falling just short of the two-thirds majority needed in the Senate to refer the amendment to the States. See 4 Cong. Rec. 5191–5192 (1876) (House vote); *id.*, at 5595 (28 yeas, 16 nays in the Senate). Afterwards, most States adopted provisions like Montana's to achieve the same objective at the state level, often as a condition of entering the Union. Thirty-eight States still have these "little Blaine Amendments" today. See App. D to Brief for Respondents.

This history is well-known and has been recognized in opinions of this Court. See, *e.g.*, *Locke* v. *Davey*, 540 U. S. 712, 723, n. 7 (2004); *Mitchell*, 530 U. S., at 828–829 (plurality opinion); see also *ante*, at 15–16; *Zelman* v. *Simmons-Harris*, 536 U. S. 639, 720–721 (2002) (BREYER, J., dissenting). But given respondents' and one dissent's efforts to downplay it in contravention of *Ramos*, see Brief for Respondents 16–23; *post*, at 4–5, n. 2 (SOTOMAYOR, J., dissenting), it deserves a brief retelling.

A wave of immigration in the mid-19th century, spurred in part by potato blights in Ireland and Germany, significantly increased this country's Catholic population.[2] Nativist fears increased with it. An entire political party, the Know Nothings, formed in the 1850s "to decrease the polit-

---

[1] See U. S. Commission on Civil Rights, School Choice: The Blaine Amendments & Anti-Catholicism 36 (2007).

[2] See T. Anbinder, Nativism and Slavery: The Northern Know Nothings and the Politics of the 1850s, pp. 6–8 (1992).

ical influence of immigrants and Catholics," gaining hundreds of seats in Federal and State Government.[3]

Catholics were considered by such groups not as citizens of the United States, but as "soldiers of the Church of Rome,"[4] who "would attempt to subvert representative government."[5] Catholic education was a particular concern. As one series of newspaper articles argued, "'Popery is the natural enemy of *general* education. . . . If it is establishing schools, it is to make them *prisons* of the youthful intellect of the country.'" C. Glenn, The Myth of the Common School 69 (1988) (Glenn) (quoting S. Morse, Foreign Conspiracy Against the Liberties of the United States (1835)). With a Catholic school breaking ground in New York City, the New York Times ran an article titled "Sectarian Education. Anti-Public School Crusade. Aggressive Attitude of the Roman Catholic Clergy—The Terrors of the Church Threatened." N. Y. Times, Aug. 24, 1873, p. 8. The project, the article concluded, would cause "intense anxiety by all who are interested in upholding the admirable system of public school education." *Ibid.*

The feelings of the day are perhaps best encapsulated by this famous cartoon, published in Harper's Weekly in 1871, which depicts Catholic priests as crocodiles slithering hungrily toward American children as a public school crumbles in the background:

––––––––––

[3] *Id.*, at 127–128, 135.

[4] *Id.*, at 110 (emphasis deleted).

[5] P. Hamburger, Separation of Church and State 206 (2002).



THE AMERICAN RIVER GANGES.

The resulting wave of state laws withholding public aid from "sectarian" schools cannot be understood outside this context. Indeed, there are stronger reasons for considering original motivations here than in *Ramos* because, unlike the neutral language of Louisiana's and Oregon's non-unanimity rules, Montana's no-aid provision retains the bigoted code language used throughout state Blaine Amendments.

The failed Blaine Amendment would have prohibited any public funds or lands devoted to schooling from "ever be[ing] under the control of any religious sect." 4 Cong. Rec. 205 (1875). As originally adopted, Montana's Constitution prohibited the state and local governments from "ever mak[ing,] directly or indirectly, any appropriation" for "any sectarian purpose" or "to aid in the support of any school . . . controlled in whole or in part by any church, sect or denomination whatever." Mont. Const., Art. XI, §8 (1889). At the time, "it was an open secret that 'sectarian' was code for 'Catholic.'" *Mitchell*, 530 U. S., at 828 (plurality opinion). Dictionaries defined a "sectarian" as a member "of a party

in religion which has separated itself from the established church, or which holds tenets different from those of the prevailing denomination in a kingdom or state"—a heretic. N. Webster, An American Dictionary of the English Language (1828); see also Independence Institute Brief 9–16 (collecting several similar definitions). Newspapers throughout the country, including in Montana, used the word in similarly pejorative fashion. See *id.,* at 17–26 (collecting several articles). The term was likewise used against Mormons and Jews.[6]

Backers of the Blaine Amendment either held nativist views or capitalized on them. When Blaine introduced the amendment, The Nation reported that it was "a Constitutional amendment directed against the Catholics"—while surmising that Blaine, whose Presidential ambitions were known, sought "to use it in the campaign to catch anti-Catholic votes."[7] The amendment had its intended galvanizing effect. "Its popularity was so great" that "even congressional Democrats," who depended on Catholic votes, "were expected to support it," and the congressional floor debates were rife with anti-Catholic sentiment, including "a tirade against Pope Pius IX."[8]

Montana's no-aid provision was the result of this same prejudice. When Congress allowed Montana into the Union in 1889, it still included prominent supporters of the failed Blaine Amendment. See Sen. Daines Brief 10–13. The Act enabling Montana to become a State required "[t]hat provision shall be made for the establishment and maintenance

---

[6] See Natelson, Why Nineteenth Century Bans on "Sectarian" Aid Are Facially Unconstitutional: New Evidence on Plain Meaning, 19 Federalist Soc. Rev. 98, 104 (2018).

[7] Green, The Blaine Amendment Reconsidered, 36 Am. J. Legal Hist. 38, 54 (1992) (quoting article; internal quotation marks omitted).

[8] DeForrest, An Overview and Evaluation of State Blaine Amendments: Origins, Scope, and First Amendment Concerns, 26 Harv. J. L. & Pub. Pol'y 551, 566, 570 (2003); see also, *e.g.*, Becket Fund Brief 5–11.

of systems of public schools . . . free from sectarian control." Act of Feb. 22, 1889, §4, 25 Stat. 677; see also Becket Fund Brief 17–18 (quoting one Senator's description of the Act as "'completing the unfinished work of the failed Blaine Amendment'"). Montana thereafter adopted its constitutional rule against public funding for any school "controlled" by a "sect." Mont. Const., Art. XI, §8 (1889). There appears to have been no doubt which schools that meant. As petitioners show, Montana's religious schools—and its private schools in general—were predominantly Catholic, see Brief for Petitioners 42, and n. 41, and anti-Catholicism was alive in Montana too. See, *e.g.*, Sen. Daines Brief 1–3 (describing a riot over an anti-Catholic sign hung over a Butte saloon on Independence Day, 1894).

Respondents argue that Montana's no-aid provision merely reflects a state interest in "preserv[ing] funding for public schools," Brief for Respondents 7, known as "common schools" during the Blaine era. Yet just as one cannot separate the Blaine Amendment from its context, "[o]ne cannot separate the founding of the American common school and the strong nativist movement."[9]

Spearheaded by Horace Mann, Secretary of the Massachusetts Board of Education from 1837 to 1848, the common-school movement did not aim to establish a system that was scrupulously neutral on matters of religion. (In a country like ours, that would have been exceedingly difficult, if not impossible.) Instead the aim was to establish a system that would inculcate a form of "least-common-denominator Protestantism."[10] This was accomplished with

———————

[9] Viteritti, Blaine's Wake: School Choice, the First Amendment, and State Constitutional Law, 21 Harv. J. L. & Pub. Pol'y 657, 667 (1998) (Viteritti, Blaine's Wake).

[10] Jeffries & Ryan, A Political History of the Establishment Clause, 100 Mich. L. Rev. 279, 298 (2001) (Jeffries & Ryan); see also, *e.g.*, CER Brief 23–26.

daily reading from the King James Bible, a curriculum that, Mann said, let the book "speak for itself." 4 Life and Works of Horace Mann 312 (1891) (Mann's 12th annual report on the Massachusetts schools; emphasis deleted). Yet it was an affront to many Christians and especially Catholics, not to mention non-Christians.[11]

Mann's goal was to "Americanize" the incoming Catholic immigrants. In fact, he and other proponents of the common-school movement used language and made insinuations that today would be considered far more inflammatory. In his 10th annual report on the Massachusetts schools, Mann described the State as "parental," assuming the responsibility of weaning children "[f ]or the support of the poor, nine-tenths of whose cost originate with foreigners or come from one prolific vice," meaning alcohol. 4 Life and Works of Horace Mann, at 132, 134 (emphasis deleted). In other writing, he described the common-school movement as "'laboring to elevate mankind into the upper and purer regions of civilization, Christianity, and the worship of the true God; all those who are obstructing the progress of this cause are impelling the race backwards into barbarism and idolatry.'" Glenn 171–172 (quoting an 1846 article by Mann in the Common School Journal).

These "obstructers" were Catholic and other religious groups and families who objected to the common schools' religious programming, which, as just seen, was not neutral on matters of religion. Objections met violent response. In Massachusetts and elsewhere, Catholic students were beaten and expelled for refusing to read from the King James Bible.[12] In New York, a mob destroyed the residence of Bishop John Hughes, who had argued that, if the State

—————————

[11] See Glenn 166; Lain, God, Civic Virtue, and the American Way: Reconstructing *Engel*, 67 Stan. L. Rev. 479, 487–488 (2015).

[12] See Jeffries & Ryan 300.

was going to fund religious public education, it should also support church schools. The militia needed to be called to protect St. Patrick's Cathedral.[13] Most notorious were the Philadelphia Bible Riots. In 1844, a rumor circulated in the city's nativist newspapers that a school director, who was Catholic, had ordered that Bible reading be stopped.[14] Months of scaremongering broke out into riots that left two of the city's Catholic churches burned and several people dead. Only by calling out the militia and positioning a cannon in front of a Catholic church—which itself had been taking cannon fire—were the riots ultimately quelled.[15]

Catholic and Jewish schools sprang up because the common schools were not neutral on matters of religion. "Faced with public schools that were culturally Protestant and with curriculum[s] and textbooks that were, consequently, rife with material that Catholics and Jews found offensive, many Catholics and Orthodox Jews created separate schools," and those "who could afford to do so sent their children to" those schools.[16]

But schools require significant funding, and when religious organizations requested state assistance, Mann and others labeled them "sectarian"—that is, people who had separated from the prevailing orthodoxy. See, *e.g.*, Jeffries & Ryan 298, 301. The Blaine movement quickly followed.

_____

[13] See Viteritti, Choosing Equality: School Choice, the Constitution, and Civil Society 151 (1999).

[14] See Sekulow & Tedesco, The Story Behind *Vidal* v. *Girard*'s Executors: Joseph Story, the Philadelphia Bible Riots, and Religious Liberty, 32 Pepperdine L. Rev. 605, 630 (2005).

[15] See *id.*, at 633–638.

[16] Brief for Union of Orthodox Jewish Congregations of America as *Amicus Curiae* in *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, O. T. 2016, No. 15–577, p. 15 (internal quotation marks, citation, and brackets omitted).

In 1854, the Know Nothing party, in many ways a forerunner of the Ku Klux Klan,[17] took control of the legislature in Mann's State of Massachusetts and championed one of the first constitutional bans on aid to "sectarian" schools (along with attempting to limit the franchise to native-born people). See Viteritti, Blaine's Wake 669–670.

Respondents and one dissent argue that Montana's no-aid provision was cleansed of its bigoted past because it was readopted for non-bigoted reasons in Montana's 1972 constitutional convention. See *post*, at 4–5, n. 2 (opinion of SOTOMAYOR, J.); see also Brief for Respondents 18; Tr. of Oral Arg. 22–23. They emphasize that the convention included Catholics, just as the constitutional convention that readopted Louisiana's purportedly racist non-unanimous jury provision included black delegates. As noted, a virtually identical argument was rejected in *Ramos*, even though "'no mention was made of race'" during the Louisiana convention debates. 590 U. S., at ___ (ALITO, J., dissenting) (slip op., at 3) (quoting *State* v. *Hankton*, 2012–0375, p. 19 (La. App. 4 Cir. 8/2/13), 122 So. 3d 1028, 1038). Under *Ramos*, it emphatically does not matter whether Montana readopted the no-aid provision for benign reasons. The provision's "uncomfortable past" must still be "[e]xamined." 590 U. S., at ___, n. 44 (opinion of the Court) (slip op., at 14, n. 44). And here, it is not so clear that the animus was scrubbed.

Delegates at Montana's constitutional convention in 1972 acknowledged that the no-aid provision was "a badge of bigotry," with one Catholic delegate recalling "being let out of school in the fourth grade to erase three 'Ks' on the front doors of the Catholic church in Billings."[18] Nevertheless the

---

[17] See generally Myers, Know Nothing and Ku Klux Klan, 219 North American Rev. 1 (Jan. 1924).

[18] 6 Montana Constitutional Convention 1971–1972, Proceedings and

convention proposed, and the State adopted, a provision
with the *same* material language, prohibiting public aid "for
any *sectarian* purpose or to aid any . . . school . . . controlled
in whole or in part by any church, *sect*, or denomination."
Mont. Const., Art. X, §6(1) (1972) (emphasis added). A lead-
ing definition of "sect" at the time, as during the Blaine era,
was "a dissenting religious body; *esp: one that is heretical in
the eyes of other members within the same communion*."
Webster's Third New International Dictionary 2052 (1971)
(emphasis added).

　Given the history above, the terms "sect" and "sectarian"
are disquieting remnants. And once again, there appears
to have been little doubt which schools this provision would
predominantly affect. In 1970, according to the National
Center for Educational Statistics, Montana had 61 reli-
giously affiliated schools. Forty-five were Roman Catho-
lic.[19] Not only did the convention delegates acknowledge
the no-aid provision's original anti-Catholic intent, but the
Montana Supreme Court had only ever applied the provi-
sion once—to a Catholic school, and one that had "carrie[d]
a sizeable portion of the total educational load" in Ana-
conda, Montana. *State ex rel. Chambers* v. *School Dist. No.
10 of Deer Lodge Cty.*, 155 Mont. 422, 430, 472 P. 2d 1013,
1017 (1970) (*per curiam*). The Montana Catholic Confer-
ence also voiced concerns about access to school funds, and
a convention delegate proposed removing the no-aid provi-
sion's restriction on "indirect" aid. See Convention Tr.

───────────

Transcript, p. 2012 (Mont. Legislature and Legislative Council) (Conven-
tion Tr.) (statement of Delegate Schiltz); see also, *e.g.*, *id.,* at 2010 (state-
ment of Delegate Harbaugh) (recognizing the provision as a Blaine
Amendment, which "espoused the purpose of the Know-nothing Party");
*id.*, at 2011 (statement of Delegate Toole) (recognizing the provision as a
Blaine Amendment); *id.*, at 2013 (statement of Chairman Graybill)
(same); *id.*, at 2027 (statement of Delegate Campbell) (same); *id.*, at 2030
(statement of Delegate Champoux) (same).

　[19] See Nat. Center for Educational Statistics, Statistics of Nonpublic
Elementary and Secondary Schools 1970–71, pp. 32–33 (1973) (Table 1).

2010, 2027. That amendment was rejected.

Thus, the no-aid provision's terms keep it "[t]ethered" to its original "bias," and it is not clear at all that the State "actually confront[ed]" the provision's "tawdry past in reenacting it." *Ramos*, 590 U. S., at ___ (SOTOMAYOR, J., concurring in part) (slip op., at 4). After all, whereas the no-aid provision had originally been foisted on Montana, the State readopted it voluntarily—"sectarian" references included. Whether or not the State did so for any reason that could be called legitimate, the convention delegates recognized that the provision would "continue to mean and do whatever it does now," Convention Tr. 2014 (statement of Delegate Loendorf), and the discrimination in this case shows that the provision continues to have its originally intended effect. And even if Montana had done more to address its no-aid provision's past, that would of course do nothing to resolve the bias inherent in the Blaine Amendments among the 17 States, by respondents' count, that have not readopted or amended them since around the turn of the 20th century.[20]

Today's public schools are quite different from those envisioned by Horace Mann, but many parents of many different faiths still believe that their local schools inculcate a worldview that is antithetical to what they teach at home. Many have turned to religious schools, at considerable expense, or have undertaken the burden of homeschooling. The tax-credit program adopted by the Montana Legisla-

---

[20] Ala. Const., Art. XIV, §263 (1901); Ariz. Const., Art. II, §12, Art. IX, §10 (1912); Colo. Const., Art. V, §34, Art. IX, §7 (1876); Del. Const., Art. X, §3 (1897); Ind. Const., Art. I, §6 (1851); Ky. Const. §189 (1891); Miss. Const., Art. 8, §208 (1890); Nev. Const., Art. XI, §10 (1880); N. H. Const., Pt. II, Art. 83 (1877); N. M. Const., Art. XII, §3 (1911); N. D. Const., Art. VIII, §152 (1889); Ohio Const., Art. VI, §2 (1851); Okla. Const., Art. II, §5 (1907); Ore. Const., Art. I, §5 (1857); S. D. Const., Art. VIII, §16 (1889); Wis. Const., Art. I, §18, Art. X, §3 (1848); Wyo. Const., Art. I, §19, Art. VII, §8 (1889).

ture but overturned by the Montana Supreme Court provided necessary aid for parents who pay taxes to support the public schools but who disagree with the teaching there. The program helped parents of modest means do what more affluent parents can do: send their children to a school of their choice.  The argument that the decision below treats everyone the same is reminiscent of Anatole France's sardonic remark that "'[t]he law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread.'"  J. Cournos, A Modern Plutarch 35 (1928).

# SUPREME COURT OF THE UNITED STATES

———————

No. 18–1195

———————

## KENDRA ESPINOZA, ET AL., PETITIONERS *v.* MONTANA DEPARTMENT OF REVENUE, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF MONTANA

[June 30, 2020]

JUSTICE GORSUCH, concurring.

The people of Montana, acting through their legislature, adopted a school choice program. It provided a modest tax credit to individuals and businesses who donated to non-profit scholarship organizations. As the program began to take root, Montana had just one scholarship organization. It granted scholarships to families who were struggling financially or had children with disabilities. Recipients were free to use the scholarships at the schools of their choice. Some families chose secular schools, others religious ones.

Kendra Espinoza, the lead petitioner in this case, is a single mother who works three jobs. She planned to use scholarships to help keep her daughters at an accredited religious school. That is, until the Montana Supreme Court struck down the tax credit program. Those seeking a tax credit were free to choose whether to direct their donations to the independent scholarship organization; the organization was then free to choose scholarship recipients; and, after that, parents were free to choose where to use those scholarships. But, the Montana Supreme Court held, this arrangement impermissibly allowed state funds to find their way to religious schools, in violation of a state constitutional provision. By way of remedy, the court ordered an end to the tax credit program, effectively killing Montana's school choice experiment: Without tax credits, donations

dry up, and so do the scholarships enabling school choice.

Today, the Court explains how the Montana Constitution, as interpreted by the State Supreme Court, violates the First Amendment by discriminating against parents and schools based on their religious status or identity. The Court explains, too, why the State Supreme Court's decision to eliminate the tax credit program fails to mask the discrimination. But for the Montana Constitution's impermissible discrimination, after all, the legislature's tax credit and scholarship program would be still operating for the benefit of Ms. Espinoza and everyone else. I agree with all the Court says on these scores and join its opinion in full. I write separately only to address an additional point.

The Court characterizes the Montana Constitution as discriminating against parents and schools based on "religious status and not religious use." *Ante,* at 10. No doubt, the Court proceeds as it does to underscore how the outcome of this case follows from *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. ___ (2017), where the Court struck down a similar public benefits restriction that, it held, discriminated on the basis of religious status. No doubt, too, discrimination on the basis of religious status raises grave constitutional questions for the reasons the Court describes. But I was not sure about characterizing the State's discrimination in *Trinity Lutheran* as focused only on religious status, and I am even less sure about characterizing the State's discrimination here that way. See *id.,* at ___–___ (slip op., at 1–2) (GORSUCH, J., concurring in part).

In the first place, discussion of religious activity, uses, and conduct—not just status—pervades this record. The Montana Constitution forbids the use of public funds "for any sectarian purpose," including to "aid" sectarian schools. Art. X, §6(1). Tracking this directive, the State Supreme Court reasoned that the legislature's tax credit program

could be used to "subsidiz[e] the sectarian school's educational program" and thereby "strengthen . . . religious education." 393 Mont. 446, 466, 467, 435 P. 3d 603, 613, 614 (2018). Meanwhile, Ms. Espinoza admits that she would like to use scholarship funds to enable her daughters to be taught in school the "same Christian values" they are taught at home. App. to Pet. for Cert. 152. Finally, in its briefing before this Court, Montana has represented that its Constitution focuses on preventing the use of tax credits to subsidize religious activity.

Not only is the record replete with discussion of activities, uses, and conduct, any jurisprudence grounded on a status-use distinction seems destined to yield more questions than answers. Does Montana seek to prevent religious parents and schools from participating in a public benefits program (status)? Or does the State aim to bar public benefits from being employed to support religious education (use)? Maybe it's possible to describe what happened here as status-based discrimination. But it seems equally, and maybe more, natural to say that the State's discrimination focused on what religious parents and schools *do*—teach religion. Nor are the line-drawing challenges here unique; they have arisen before and will again. See *Trinity Lutheran*, 582 U. S., at \_\_\_–\_\_\_ (slip op., at 1–2) (opinion of GORSUCH, J.).

Most importantly, though, it is not as if the First Amendment cares. The Constitution forbids laws that prohibit the free exercise of religion. That guarantee protects not just the right to *be* a religious person, holding beliefs inwardly and secretly; it also protects the right to *act* on those beliefs outwardly and publicly. At the time of the First Amendment's adoption, the word "exercise" meant (much as it means today) some "[l]abour of the body," a "[u]se," as in the "actual application of any thing," or a "[p]ractice," as in some "outward performance." 1 S. Johnson, A Dictionary of the English Language (4th ed. 1773); see also *ibid.* (5th ed. 1784). By speaking of a right to "free exercise," rather than

a right "of conscience," an alternative the framers considered and rejected, our Constitution "extended the broader freedom of action to all believers." McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L. Rev. 1409, 1490 (1989). So whether the Montana Constitution is better described as discriminating against religious status or use makes no difference: It is a violation of the right to free exercise either way, unless the State can show its law serves some compelling and narrowly tailored governmental interest, conditions absent here for reasons the Court thoroughly explains.

Our cases have long recognized the importance of protecting religious actions, not just religious status. In its very first decision applying the Free Exercise Clause to the States, the Court explained that the First Amendment protects the "freedom to act" as well as the "freedom to believe." *Cantwell* v. *Connecticut*, 310 U. S. 296, 303 (1940). The Court then reversed a criminal conviction against Newton Cantwell and his sons, Jehovah's Witnesses who were prosecuted not because of who they were but because of what they did—proselytize door-to-door without a license. See *id.*, at 300–301, 307, 311. In fact, this Court has already recognized that parents' decisions about the education of their children—the very conduct at issue here—can constitute protected religious activity. In *Wisconsin* v. *Yoder*, 406 U. S. 205 (1972), the Court held that Amish parents could not be compelled to send their children to a public high school if doing so would conflict with the dictates of their faith. See *id.*, at 214–215, 220, 234–235.

Even cases that seemingly focus on religious status do so with equal respect for religious actions. In *McDaniel* v. *Paty*, 435 U. S. 618 (1978) (plurality opinion), for example, a State had barred the clergy from serving in the state legislature or at the state constitutional convention. See *id.,* at 620–622. Some have described the discrimination there as focused on religious "'status.'" *Trinity Lutheran*, 582

U. S., at \_\_\_ (slip op., at 7) (quoting *McDaniel*, 435 U. S., at 627) (emphasis deleted). But no one can question that conduct lurked just beneath the surface. After all, the State identified clergy based on their "conduct and activity," and the plurality opinion concluded that the State's prohibition was based on "status, acts, and conduct." 435 U. S., at 627; see also *id.,* at 630–633 (Brennan, J., concurring in judgment); *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520 (1993).

Consistently, too, we have recognized the First Amendment's protection for religious conduct in public benefits cases. When the government chooses to offer scholarships, unemployment benefits, or other affirmative assistance to its citizens, those benefits necessarily affect the "baseline against which burdens on religion are measured." *Locke* v. *Davey*, 540 U. S. 712, 726 (2004) (Scalia, J., dissenting) (citing *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 16 (1947)). So, as we have long explained, the government "penalize[s] religious activity" whenever it denies to religious persons an "equal share of the rights, benefits, and privileges enjoyed by other citizens." *Lyng* v. *Northwest Indian Cemetery Protective Assn.*, 485 U. S. 439, 449 (1988). What benefits the government decides to give, whether meager or munificent, it must give without discrimination against religious conduct.

Our cases illustrate the point. In *Sherbert* v. *Verner*, 374 U. S. 398 (1963), for example, a State denied unemployment benefits to Adell Sherbert not because she was a Seventh Day Adventist but because she had put her faith into practice by refusing to labor on the day she believed God had set aside for rest. See *id.*, at 399–401. Recognizing her right to exercise her religion freely, the Court held that Ms. Sherbert was entitled to benefits. See *id.*, at 410. Similarly, in *Thomas* v. *Review Bd. of Ind. Employment Security Div.*, 450 U. S. 707 (1981), the Court held that Eddie Thomas had

the right to resign from his job and still collect an unemployment check after he decided he could not assemble military tank turrets consistent with the teachings of his faith. See *id.*, at 709–712, 720. In terms that speak equally to our case, the Court explained that the government tests the Free Exercise Clause whenever it "conditions receipt of an important benefit upon conduct proscribed by a religious faith, or . . . denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.*, at 717–718.

The First Amendment protects religious uses and actions for good reason. What point is it to tell a person that he is free to *be* Muslim but he may be subject to discrimination for *doing* what his religion commands, attending Friday prayers, living his daily life in harmony with the teaching of his faith, and educating his children in its ways? What does it mean to tell an Orthodox Jew that she may have her religion but may be targeted for observing her religious calendar? Often, governments lack effective ways to control what lies in a person's heart or mind. But they can bring to bear enormous power over what people say and do. The right to *be* religious without the right to *do* religious things would hardly amount to a right at all.

If the government could intrude so much in matters of faith, too, winners and losers would soon emerge. Those apathetic about religion or passive in its practice would suffer little in a world where only inward belief or status is protected. But what about those with a deep faith that requires them to do things passing legislative majorities might find unseemly or uncouth—like knocking on doors to spread their beliefs, refusing to build tank turrets during wartime, or teaching their children at home? "[T]hose who take their religion seriously, who think that their religion should affect the whole of their lives," and those whose religious beliefs and practices are least popular, would face

the greatest disabilities. *Mitchell* v. *Helms*, 530 U. S. 793, 827–828 (2000) (plurality opinion). A right meant to protect minorities instead could become a cudgel to ensure conformity.

It doesn't take a long or searching look through history or around the world to see how this can go. In the century before our Nation's founding, Oliver Cromwell promised to Catholics in Ireland: "'As to freedom of conscience, I meddle with no man's conscience; but if you mean by that, liberty to celebrate the Mass, I would have you understand that in no place where the power of the Parliament of England prevails shall that be permitted.'" *McDaniel*, 435 U. S., at 631, n. 2 (opinion of Brennan, J.) (quoting S. Hook, Paradoxes of Freedom 23 (1962)); see also 1 T. Carlyle, Oliver Cromwell's Letters and Speeches 395 (1845) (recording Cromwell's October 19, 1649, letter to the Governor of Ross). Even today, in fiefdoms small and large, people of faith are made to choose between receiving the protection of the State and living lives true to their religious convictions.

Of course, in public benefits cases like the one before us the stakes are not so dramatic. Individuals are forced only to choose between forgoing state aid or pursuing some aspect of their faith. The government does not put a gun to the head, only a thumb on the scale. But, as so many of our cases explain, the Free Exercise Clause doesn't easily tolerate either; any discrimination against religious exercise must meet the demands of strict scrutiny. In this way, the Clause seeks to ensure that religion remains "a matter of voluntary choice by individuals and their associations, [where] each sect 'flourish[es] according to the zeal of its adherents and the appeal of its dogma,'" influenced by neither where the government points its gun nor where it places its thumb. *McDaniel*, 435 U. S., at 640 (opinion of Brennan J.) (quoting *Zorach* v. *Clauson*, 343 U. S. 306, 313 (1952)).

Montana's Supreme Court disregarded these foundational principles. Effectively, the court told the state legislature and parents of Montana like Ms. Espinoza: You can have school choice, but if anyone dares to choose to send a child to an accredited religious school, the program will be shuttered. That condition on a public benefit discriminates against the free exercise of religion. Calling it discrimination on the basis of religious status or religious activity makes no difference: It is unconstitutional all the same.

# SUPREME COURT OF THE UNITED STATES

No. 18–1195

KENDRA ESPINOZA, ET AL., PETITIONERS *v.*
MONTANA DEPARTMENT OF REVENUE, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
MONTANA

[June 30, 2020]

JUSTICE GINSBURG, with whom JUSTICE KAGAN joins, dissenting.

The Montana Legislature enacted a scholarship program to fund tuition for students attending private secondary schools. See Mont. Code Ann. §15–30–3111 (2019). In the decision below, the Montana Supreme Court struck down that program in its entirety. The program, the state court ruled, conflicted with the State Constitution's no-aid provision, which forbids government appropriations to religious schools. Mont. Const., Art. X, §6(1). Parents who sought to use the program's scholarships to fund their children's religious education challenged the state court's ruling. They argue in this Court that the Montana court's application of the no-aid provision violated the Free Exercise Clause of the Federal Constitution. Importantly, the parents, petitioners here, disclaim any challenge to the no-aid provision on its face. They instead argue—and this Court's majority accepts—that the provision is unconstitutional as applied because the First Amendment prohibits discrimination in tuition-benefit programs based on a school's religious status. Because the state court's decision does not so discriminate, I would reject petitioners' free exercise claim.

The First Amendment prohibits the government from "mak[ing a] law . . . prohibiting the free exercise" of religion.

U. S. Const., Amdt. 1.  This Court's decisions have recognized that a burden on religious exercise may occur both when a State proscribes religiously motivated activity and when a law pressures an adherent to abandon her religious faith or practice.  *Sherbert* v. *Verner*, 374 U. S. 398, 406 (1963); *Hobbie* v. *Unemployment Appeals Comm'n of Fla.*, 480 U. S. 136, 140–141 (1987).  The Free Exercise Clause thus protects against "indirect coercion or penalties on the free exercise of religion."  *Lyng* v. *Northwest Indian Cemetery Protective Assn.*, 485 U. S. 439, 450 (1988).  Invoking that principle in *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. ___ (2017), the Court observed that disqualifying an entity from a public benefit "solely because of [the entity's] religious character" can impose "a penalty on the free exercise of religion."  *Id.*, at ___–___ (slip op., at 9–10).  The Court then concluded that a Missouri law making churches ineligible for a government playground-refurbishing grant impermissibly burdened the church's religious exercise by "put[ting it] to the choice between being a church and receiving a government benefit."  *Id.*, at ___ (slip op., at 13).

Petitioners argue that the Montana Supreme Court's decision fails when measured against *Trinity Lutheran.*  I do not see how.  Past decisions in this area have entailed *differential treatment* occasioning a burden on a plaintiff's religious exercise.  *Lyng*, 485 U. S., at 450–451; *Trinity Lutheran*, 582 U. S., at ___ (slip op., at 11).  This case is missing that essential component.  Recall that the Montana court remedied the state constitutional violation by striking the scholarship program in its entirety.  Under that decree, secular and sectarian schools alike are ineligible for benefits, so the decision cannot be said to entail differential treatment based on petitioners' religion.  Put somewhat differently, petitioners argue that the Free Exercise Clause requires a State to treat institutions and people neutrally when doling out a benefit—and neutrally is how Montana

treats them in the wake of the state court's decision.

Accordingly, the Montana Supreme Court's decision does not place a burden on petitioners' religious exercise. Petitioners may still send their children to a religious school. And the Montana Supreme Court's decision does not pressure them to do otherwise. Unlike the law in *Trinity Lutheran*, the decision below puts petitioners to no "choice": Neither giving up their faith, nor declining to send their children to sectarian schools, would affect their entitlement to scholarship funding. 582 U. S., at \_\_\_ (slip op., at 10). There simply are no scholarship funds to be had.

True, petitioners expected to be eligible for scholarships under the legislature's program, and to use those scholarships at a religious school. And true, the Montana court's decision disappointed those expectations along with those of parents who send their children to secular private schools. But, as JUSTICE SOTOMAYOR observes, see *post,* at 3 (dissenting opinion), this Court has consistently refused to treat neutral government action as unconstitutional solely because it fails to benefit religious exercise. See *Sherbert*, 374 U. S., at 412 (Douglas, J., concurring) ("[T]he Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.").

These considerations should be fatal to petitioners' free exercise claim, yet the Court does not confront them. Instead, the Court decides a question that, in my view, this case does not present: "[W]hether excluding religious schools and affected families from [the scholarship] program was consistent with the Federal Constitution." *Ante*, at 7 (majority opinion). The Court goes on to hold that the Montana Supreme Court's application of the no-aid provision violates the Free Exercise Clause because it "'condition[s] the availability of benefits upon a recipient's willingness to surrender [its] religiously impelled status.'" *Ante*, at 11 (quoting *Trinity Lutheran*, 582 U. S., at \_\_\_–\_\_\_ (slip

op., at 9–10); alterations in original). As I see it, the deci-
sion below—which maintained neutrality between sec-
tarian and nonsectarian private schools—did no such thing.

Finding the "beginning" of the Montana Supreme Court's
decision erroneous, this Court regards the state court's ul-
timate judgment as irrelevant. *Ante,* at 20–22. In the
Court's recounting, the Montana court first held that reli-
gious schools must be excluded from the scholarship pro-
gram—necessarily determining that the Free Exercise
Clause permitted that result—and only subsequently
struck the entire program as a way of carrying out its hold-
ing. See *ante,* at 21 ("When the [Montana Supreme] Court
was called upon to apply a state law no-aid provision to ex-
clude religious schools from the program, it was obligated
by the Federal Constitution to reject the invitation."). But
the initial step described by this Court is imaginary. The
Montana court determined that the scholarship program vi-
olated the no-aid provision because it resulted in aid to re-
ligious schools. Declining to rewrite the statute to exclude
those schools, the state court struck the program in full.
393 Mont. 446, 463–468, 435 P. 3d 603, 612–614 (2018). In
doing so, the court never made religious schools ineligible
for an otherwise available benefit, and it never decided that
the Free Exercise Clause would allow that outcome.[1]

Thus, contrary to this Court's assertion, see *ante,* at 21,
the no-aid provision did not require the Montana Supreme

_____

[1] In its opinion, Montana's highest court stated without explanation
that this case is not one in which application of the no-aid provision vio-
lates the Free Exercise Clause. 393 Mont., at 468, 435 P. 3d, at 614.
When the court made that statement, it had already invalidated the en-
tire scholarship program. *Ibid.* Accordingly, the court's statement can-
not be understood to have approved of excluding religious schools from
an otherwise available scholarship. Instead, the statement is most fairly
read to convey that the Free Exercise Clause allows a State to decline to
fund any private schools, an outcome that avoids state aid to religious
schools.

Court to "exclude" religious schools from the scholarship program. The provision mandated only that the state treasury not be used to fund religious schooling. As this case demonstrates, that mandate does not necessarily require differential treatment. The no-aid provision can be implemented in two ways. A State may distinguish within a benefit program between secular and sectarian schools, or it may decline to fund all private schools. The Court agrees that the First Amendment permits the latter course. See *ante,* at 20. Because that is the path the Montana Supreme Court took in this case, there was no reason for this Court to address the alternative.

By urging that it is impossible to apply the no-aid provision in harmony with the Free Exercise Clause, the Court seems to treat the no-aid provision itself as unconstitutional. See *ante,* at 21. Petitioners, however, disavowed a facial First Amendment challenge, and the state courts were never asked to address the constitutionality of the no-aid provision divorced from its application to a specific government benefit. See, *e.g.*, Reply Brief 8, 20, 21–22. This Court therefore had no call to reach that issue. See *Adams* v. *Robertson*, 520 U. S. 83, 90 (1997) (*per curiam*) ("'[I]t would be unseemly in our dual system of government' to disturb the finality of state judgments on a federal ground that the state court did not have occasion to consider." (quoting *Webb* v. *Webb*, 451 U. S. 493, 500 (1981))). The only question properly raised is whether application of the no-aid provision to bar all state-sponsored private-school funding violates the Free Exercise Clause. For the reasons stated, *supra,* at 2–3, it does not.

Nearing the end of its opinion, the Court writes: "A State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious." *Ante*, at 20. Because Montana's Supreme Court did not make such a decision— its judgment put all private school parents in the same

boat—this Court had no occasion to address the matter.[2]
On that sole ground, and reaching no other issue, I dissent
from the Court's judgment.

_____

[2] The Montana Supreme Court's decision leaves parents where they
would be had the State never enacted a scholarship program.  In that
event, no one would argue that Montana was obliged to provide such a
program solely for parents who send their children to religious schools.
But cf. *ante,* at 13 (ALITO, J., concurring) (inapt reference to Anatole
France's remark).

# SUPREME COURT OF THE UNITED STATES

―――――――

No. 18–1195

―――――――

## KENDRA ESPINOZA, ET AL., PETITIONERS *v.* MONTANA DEPARTMENT OF REVENUE, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
MONTANA

[June 30, 2020]

JUSTICE BREYER, with whom JUSTICE KAGAN joins as to Part I, dissenting.

The First Amendment's Free Exercise Clause guarantees the right to practice one's religion. At the same time, its Establishment Clause forbids government support for religion. Taken together, the Religion Clauses have helped our Nation avoid religiously based discord while securing liberty for those of all faiths.

This Court has long recognized that an overly rigid application of the Clauses could bring their mandates into conflict and defeat their basic purpose. See, *e.g.*, *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 668–669 (1970). And this potential conflict is nowhere more apparent than in cases involving state aid that serves religious purposes or institutions. In such cases, the Court has said, there must be constitutional room, or "'play in the joints,'" between "what the Establishment Clause permits and the Free Exercise Clause compels." *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 6) (quoting *Locke* v. *Davey*, 540 U. S. 712, 718 (2004)). Whether a particular state program falls within that space depends upon the nature of the aid at issue, considered in light of the Clauses' objectives.

The majority barely acknowledges the play-in-the-joints

doctrine here.  It holds that the Free Exercise Clause for-
bids a State to draw any distinction between secular and
religious uses of government aid to private schools that is
not required by the Establishment Clause.  The majority's
approach and its conclusion in this case, I fear, risk the kind
of entanglement and conflict that the Religion Clauses are
intended to prevent.  I consequently dissent.

I

In 2015, Montana's Legislature enacted a statute giving
a $150 tax credit to any person who contributes at least that
amount to an organization that provides scholarships for
students who attend non-public schools.  See Mont. Code
Ann. §15–30–3111 (2019).  The overwhelming majority of
these schools are religious.  (In 2018, 94% of the scholar-
ships awarded helped to pay religious-school tuition.  393
Mont. 446, 466, 478–479, and n. 6, 435 P. 3d 603, 613, 621,
and n. 6; App to Pet. for Cert. 123, 125.)  The Montana Su-
preme Court held that this program violated a state consti-
tutional provision that forbids the legislature to make "any
direct or indirect appropriation or payment" for "any sec-
tarian purpose or to aid any church, school, academy . . .
controlled in whole or in part by any church, sect, or denom-
ination."  Mont. Const., Art. X, §6.

Petitioners are the parents of students who attend one of
Montana's Christian private schools.  They believe that the
tenets of their faith require them to send their children to a
religious school.  And they claim that, by preventing them
from using state-supported scholarships at those schools,
the Montana Supreme Court's interpretation of Montana's
Constitution violates their First Amendment right to free
exercise.  I shall assume, for purposes of this opinion, that
petitioners' free exercise claim survived the Montana Su-
preme Court's wholesale invalidation of the tax credit pro-
gram.  Cf. *ante*, at 2 (GINSBURG, J., dissenting); *post*, at 2–
3 (SOTOMAYOR, J., dissenting).

## A

We all recognize that the First Amendment prohibits discrimination against religion. At the same time, our history and federal constitutional precedent reflect a deep concern that state funding for religious teaching, by stirring fears of preference or in other ways, might fuel religious discord and division and thereby threaten religious freedom itself. See, *e.g., Committee for Public Ed. & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 794–796 (1973). The Court has consequently made it clear that the Constitution commits the government to a "position of neutrality" in respect to religion. *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203, 226 (1963).

The inherent tension between the Establishment and Free Exercise Clauses means, however, that the "course of constitutional neutrality in this area cannot be an absolutely straight line." *Walz*, 397 U. S., at 669. Indeed, "rigidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited." *Ibid.*

That, in significant part, is why the Court has held that "there is room for play in the joints" between the Clauses' express prohibitions that is "productive of a benevolent neutrality," allowing "religious exercise to exist without sponsorship and without interference." *Ibid.* It has held that there "are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause." *Locke*, 540 U. S., at 719; see *Cutter* v. *Wilkinson*, 544 U. S. 709, 719 (2005). And that "play in the joints" should, in my view, play a determinative role here.

It may be that, under our precedents, the Establishment Clause does not *forbid* Montana to subsidize the education of petitioners' children. But, the question here is whether the Free Exercise Clause *requires* it to do so. The majority believes that the answer to that question is "yes." It writes that "once a State decides" to support nonpublic education,

"it cannot disqualify some private schools solely because they are religious." *Ante*, at 20. I shall explain why I disagree.

## B

As the majority acknowledges, two cases are particularly relevant: *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. ___, and *Locke* v. *Davey*, 540 U. S. 712. In *Trinity Lutheran*, we considered whether Missouri could exclude a church-owned preschool from applying for a grant to renovate its playground. The Court assumed that the Establishment Clause *permitted* the State to make grants of this kind to church-affiliated schools. See 582 U. S., at ___ (slip op., at 6). But, the Court added, this did not "answer the question" because there is "'play in the joints' between what the Establishment Clause permits and the Free Exercise Clause compels." *Ibid.* The Court therefore went on to consider the burdens that Missouri's law imposed upon the church's right to free exercise.

By excluding schools with ties to churches, the Court wrote, the State's law put the church "to a choice: It may participate in an otherwise available benefit program or remain a religious institution." *Id.*, at ___ (slip op., at 10). That kind of "'indirect coercion,'" the Court explained, "imposes a penalty on the free exercise of religion that triggers the most exacting scrutiny." *Id.*, at ___, ___ (slip op., at 10, 11). Finding that a State's "policy preference for skating as far as possible from religious establishment concerns" could not satisfy that standard, the Court held that the Free Exercise Clause *required* Missouri to include church-affiliated schools as candidates for playground renovation grants. *Id.*, at ___ (slip op., at 14).

We confronted a different kind of aid program, and came to a different conclusion, in *Locke*. There, we reviewed a Washington law that offered taxpayer-funded scholarships to college students on the express condition that they not

pursue degrees that were "'devotional in nature or designed to induce religious belief.'" 540 U. S., at 716; see *id.*, at 719, n. 2 (quoting Wash. Const., Art. II, §11). Again, the Court assumed that the Establishment Clause *permitted* the State to support students seeking such degrees. 540 U. S., at 719. But the Court concluded that the Free Exercise Clause did not *require* it to do so.

The Court observed that the State's decision not to fund devotional degrees did not penalize religious exercise or require anyone to choose between their faith and a "government benefit." *Id.*, at 721. Rather, the State had "merely chosen not to fund a distinct category of instruction" that was "essentially religious." *Ibid.* Although Washington's Constitution drew "a more stringent line than that drawn by the United States Constitution," the Court found that the State's position was consistent with the widely shared view, dating to the founding of the Republic, that taxpayer-supported religious indoctrination poses a threat to individual liberty. *Id.*, at 722. Given this "historic and substantial state interest," the Court concluded, it would be inappropriate to subject Washington's law to a "presumption of unconstitutionality." *Id.*, at 725. And, without such a presumption, the claim that the exclusion of devotional studies violated the Free Exercise Clause "must fail," for "[i]f any room exists between the two Religion Clauses, it must be here." *Ibid.*; see *id.*, at 721, n. 3.

### C

The majority finds that the school-playground case, *Trinity Lutheran*, and not the religious-studies case, *Locke*, controls here. I disagree. In my view, the program at issue here is strikingly similar to the program we upheld in *Locke* and importantly different from the program we found unconstitutional in *Trinity Lutheran*. Like the State of Washington in *Locke*, Montana has chosen not to fund (at a distance) "an essentially religious endeavor"—an education

designed to "'induce religious faith.'" *Locke*, 540 U. S., at
716, 721. That kind of program simply cannot be likened to
Missouri's decision to exclude a church school from apply-
ing for a grant to resurface its playground.

The Court in *Locke* recognized that the study of devo-
tional theology can be "akin to a religious calling as well as
an academic pursuit." *Id.*, at 721. Indeed, "the shaping,
through primary education, of the next generation's minds
and spirits" may be as critical as training for the ministry,
which itself, after all, is but one of the activities necessary
to help assure a religion's survival. *Zelman* v. *Simmons-
Harris*, 536 U. S. 639, 725 (2002) (BREYER, J., dissenting).
That is why many faith leaders emphasize the central role
of schools in their religious missions. See, *e.g.*, Southern
Baptist Convention, Resolution on the Importance of
Christ-Centered Education (2014) (underscoring the power
of Christian schools to "win students to salvation through
evangelism, make disciples, and foster spiritual develop-
ment"); The Holy See, John Paul II, Catechesi Tradendae
¶69 (Oct. 16, 1979) (explaining that "the underlying reason
for" the Catholic school "is precisely the quality of the reli-
gious instruction integrated into the education of the pu-
pils"). It is why at least some teachers at religious schools
see their work as a form of ministry. See, *e.g.*, *Hosanna-
Tabor Evangelical Lutheran Church and School* v. *EEOC*,
565 U. S. 171, 192 (2012). And petitioners have testified
that it is a "major reason" why they chose religious schools
for their children. App. to Pet. for Cert. 152 (the school
teaches "the same Christian values that I teach at home").

Nothing in the Constitution discourages this type of in-
struction. To the contrary, the Free Exercise Clause draws
upon a history that places great value upon the freedom of
parents to teach their children the tenets of their faith. Cf.
*Wisconsin* v. *Yoder*, 406 U. S. 205, 213–214 (1972). The
leading figures of America's Enlightenment followed in the
footsteps of those who, after the English civil wars, came to

believe "with a passionate conviction that they were enti-
tled to worship God in their own way and to teach their chil-
dren and to form their characters in the way that seemed
to them calculated to impress the stamp of the God-fearing
man." C. Radcliffe, The Law & Its Compass 71 (1960). But
the bitter lesson of religious conflict also inspired the Es-
tablishment Clause and the state-law bans on compelled
support the Court cited in *Locke*. Cf., *e.g.*, J. Madison, Me-
morial and Remonstrance Against Religious Assessments,
reprinted in *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1,
69 (1947) (appendix to dissent of Rutledge, J.) (recalling the
"[t]orrents of blood" shed in efforts to establish state reli-
gion).

What, then, is the difference between *Locke* and the pre-
sent case? And what is it that leads the majority to con-
clude that funding the study of religion is more like paying
to fix up a playground (*Trinity Lutheran*) than paying for a
degree in theology (*Locke*)? The majority's principal argu-
ment appears to be that, as in *Trinity Lutheran*, Montana
has excluded religious schools from its program "solely be-
cause of the religious character of the schools." *Ante*, at 9.
The majority seeks to contrast this *status*-based discrimi-
nation with the program at issue in *Locke*, which it says
denied scholarships to divinity students based on the reli-
gious *use* to which they put the funds—*i.e.*, training for the
ministry, as opposed to secular professions. See *ante*, at 11
(citing *Trinity Lutheran*, 582 U. S., at \_\_\_–\_\_\_ (slip op., at
9–10)).

It is true that Montana's no-aid provision broadly bars
state aid to schools based on their religious affiliation. But
this case does not involve a claim of status-based discrimi-
nation. The schools do not apply or compete for scholar-
ships, they are not parties to this litigation, and no one here
purports to represent their interests. We are instead faced
with a suit by *parents* who assert that *their* free exercise
rights are violated by the application of the no-aid provision

to prevent them from *using* taxpayer-supported scholar-
ships to attend the schools of their choosing. In other
words, the problem, as in *Locke*, is what petitioners
"'propos[e] *to do*—use the funds to'" obtain a religious edu-
cation. *Ante*, 13 (quoting *Trinity Lutheran*, 582 U. S., at ___
(slip op., at 12)).

Even if the schools' status were relevant, I do not see
what bearing the majority's distinction could have here.
There is no dispute that religious schools seek generally to
inspire religious faith and values in their students. How
else could petitioners claim that barring them from using
state aid to attend these schools violates their free exercise
rights? Thus, the question in this case—unlike in *Trinity
Lutheran*—boils down to what the schools would *do* with
state support. And the upshot is that here, as in *Locke*, we
confront a State's decision not to fund the inculcation of re-
ligious truths.

The majority next contends that there is no "'historic and
substantial' tradition against aiding" religious schools
"comparable to the tradition against state-supported clergy
invoked by *Locke*." *Ante*, at 16. But the majority ignores
the reasons for the founding era bans that we relied upon
in *Locke*.

"Perhaps the most famous example," *Locke*, 540 U. S., at
722, n. 6, is the 1786 defeat of a Virginia bill (often called
the Assessment Bill) that would have levied a tax in sup-
port of "learned teachers" of "the Christian Religion." A Bill
Establishing a Provision for Teachers of the Christian Reli-
gion, reprinted in *Everson*, 330 U. S., at 72 (supplemental
appendix to dissent of Rutledge, J.). In his Memorial and
Remonstrance against that proposal, James Madison ar-
gued that compelling state sponsorship of religion in this
way was "a signal of persecution" that "degrades from the
equal rank of citizens all those whose opinions in religion
do not bend to those of the Legislative authority." *Id.*, at
68–69. Even among those who might benefit from such a

tax, Madison warned, the bill threatened to "destroy that moderation and harmony which the forbearance of our laws to intermeddle with Religion, has produced among its several sects." *Id.*, at 69.

The opposition galvanized by Madison's Remonstrance not only scuttled the Assessment Bill; it spurred Virginia's Assembly to enact a very different law, the Bill for Religious Liberty drafted by Thomas Jefferson. See Brant, Madison: On the Separation of Church and State, 8 Wm. & Mary Q. 3, 11 (1951); Drakeman, Religion and the Republic: James Madison and the First Amendment, 25 J. Church & St. 427, 436 (1983); *Everson*, 330 U. S., at 12.

Like the Remonstrance, Jefferson's bill emphasized the risk to religious liberty that state-supported religious indoctrination threatened. "[T]o compel a man to furnish contributions of money for the propagation of opinions which he disbelieves," the preamble declared, "is sinful and tyrannical." A Bill for Establishing Religious Freedom (1779), in 2 The Papers of Thomas Jefferson 545 (J. Boyd ed. 1950). The statute accordingly provided "that no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever." *Id.*, at 546. Similar proscriptions were included in the early constitutions of many States. See *Locke*, 540 U. S., at 723 (collecting examples).

I see no meaningful difference between the concerns that Madison and Jefferson raised and the concerns inevitably raised by taxpayer support for scholarships to religious schools. In both instances state funds are sought for those who would "instruc[t] such citizens, as from their circumstances and want of education, cannot otherwise attain such knowledge" in the tenets of religious faith. A Bill Establishing a Provision for Teachers of the Christian Religion, reprinted in *Everson*, 330 U. S., at 72. In both cases, that would compel taxpayers "to support the propagation of opinions" on matters of religion with which they may disagree, by teachers whom they have not chosen. A Bill for

Establishing Religious Freedom, *supra*, at 545. And, in both cases, the allocation of state aid to such purposes threatens to "destroy that moderation and harmony which the forbearance of our laws to intermeddle with Religion, has produced among its several sects." Memorial and Remonstrance, reprinted in *Everson*, 330 U. S., at 69.

The majority argues that at least some early American governments saw no contradiction between bans on compelled support for clergy and taxpayer support for religious schools or universities. See *ante*, at 14, n. 3. That some States appear not to have read their prohibitions on compelled support to bar this kind of sponsorship, however, does not require us to blind ourselves to the obvious contradiction between the *reasons* for prohibiting compelled support and the effect of taxpayer funding for religious education. Madison and Jefferson saw it clearly. They opposed including theological professorships in their plans for the public University of Virginia and the Commonwealth hesitated even to grant charters to religiously affiliated schools. See Buckley, After Disestablishment: Thomas Jefferson's Wall of Separation in Antebellum Virginia, 61 J. So. Hist. 445, 453 (1995); Brant, *supra,* at 19–20.

As for the majority's examples, it suffices to say that the record is not so simple. In Georgia, the Governor advocated for school funding legislation in terms that mirrored the language of Virginia's Assessment Bill. See R. Gabel, Public Funds for Church and Private Schools 241–242 (1937). And the general levies the majority cites from Pennsylvania and New Jersey were not adopted until after the founding. See *id.,* at 215–216; see C. Kaestle, Pillars of the Republic: Common Schools and American Society, 1780–1860, pp. 166–167 (1983).

That is not to deny that the history of state support for denominational schools is "'complex.'" *Ante*, at 16. But founding era attitudes toward compelled support of clergy were no less complex. Many prominent members of the

founding generation, including George Washington, Patrick Henry, and John Marshall, supported Virginia's Assessment Bill. See Dreisbach, George Mason's Pursuit of Religious Liberty in Revolutionary Virginia, 108 Va. Mag. Hist. & Biography 5, 31 (2000). Some who supported this kind of government aid thought it posed no threat to freedom of conscience; others denied that provisions for aid to religion amounted to an "establishment" at all. See *id.,* at 34–35; D. Drakeman, Church, State, and Original Intent 224–225 (2010). Indeed, at least one historian has persuasively argued that it is next to impossible to attribute to the Founders any uniform understanding as to what constitutes, in the Constitution's phrase, "an Establishment of religion." *Id.*, at 216–229, 260–262.

This diversity of opinion made no difference in *Locke* and it makes no difference here. For our purposes it is enough to say that, among those who gave shape to the young Republic were people, including Madison and Jefferson, who perceived a grave threat to individual liberty and communal harmony in tax support for the teaching of religious truths. These "historic and substantial" concerns have consistently guided the Court's application of the Religion Clauses since. *Locke*, 540 U. S., at 725; see, *e.g.*, *Nyquist*, 413 U. S., at 794–798; *Walz*, 397 U. S., at 695 (Harlan, J., concurring); *Schempp*, 374 U. S., at 307 (Goldberg, J., joined by Harlan, J., concurring). The Court's special attention to these views should come as no surprise, for the risks the Founders saw have only become more apparent over time. In the years since the Civil War, the number of religions practiced in our country has grown to scores. And that has made it more difficult to avoid suspicions of favoritism—or worse—when government becomes entangled with religion.

Nor can I see how it could make a difference that the Establishment Clause might *permit* the State to subsidize religious education through a program like Montana's. The

tax benefit here inures to donors, who choose to support a particular scholarship organization. That organization, in turn, awards scholarships to students for the qualifying school of their choice. The majority points to cases in which we have upheld programs where, as here, state funds make their way to religious schools by means of private choices. *Ante*, at 7 (citing *Zelman*, 536 U. S., at 649–653). As the Court acknowledged in *Trinity Lutheran*, however, that does not answer the question whether providing such aid is *required*. 582 U. S., at ___ (slip op., at 6).

Neither does it address related concerns that I have previously described. Private choice cannot help the taxpayer who does not want to finance the propagation of religious beliefs, whether his own or someone else's. It will not help religious minorities too few in number to support a school that teaches their beliefs. And it will not satisfy those whose religious beliefs preclude them from participating in a government-sponsored program. Some or many of the persons who fit these descriptions may well feel ignored— or worse—when public funds are channeled to religious schools. See *Zelman*, 536 U. S., at 728 (BREYER, J., dissenting). These feelings may, in turn, sow religiously inspired political conflict and division—a risk that is considerably greater where States are *required* to include religious schools in programs like the one before us here. And it is greater still where, as here, those programs benefit only a handful of a State's many religious denominations. See *ibid.*; Big Sky Scholarships, Schools (2019), www.bigskyscholarships.org/schools.

Indeed, the records of Montana's constitutional convention show that these concerns were among the reasons that a religiously diverse group of delegates, including faith leaders of different denominations, supported the no-aid provision. See Brief for Respondents 18–23; Brief for Montana Constitutional Convention Delegates as *Amici Curiae* 19–21, 22, 24–25 (noting support for the provision from a

Congregationalist minister, the Roman Catholic priest responsible for Catholic schools in the Diocese of Great Falls, a Methodist pastor, a Presbyterian minister, and the Montana Catholic Conference, among others).

In an effort to downplay this risk and further distinguish this case from *Locke*, the majority contends that "Montana's Constitution does not zero in on any particular 'essentially religious' course of instruction." *Ante*, at 13 (quoting *Locke*, 540 U. S., at 721). But this is not a facial challenge to the no-aid provision. See Reply Brief 8. As applied, the provision affects only a scholarship program that, in effect, uses taxpayer funds to help pay for student tuition at religious schools. We have long recognized that unrestricted cash payments of this kind raise special establishment concerns. Cf. *Mitchell* v. *Helms*, 530 U. S. 793, 818–819 (2000) (plurality opinion); see *id.*, at 848–849 (O'Connor, J., concurring in judgment). And for good reason: The subsidy petitioners demand would go to pay for, among other things, the salaries of teachers and administrators who have been found in at least some instances to so "personify [the] beliefs" of the churches that employ them that they are quite literally "ministers" within the meaning of the First Amendment. *Hosanna-Tabor*, 565 U. S., at 188.

If, for 250 years, we have drawn a line at forcing taxpayers to pay the salaries of those who teach their faith from the pulpit, I do not see how we can today require Montana to adopt a different view respecting those who teach it in the classroom.

## II

In reaching its conclusion that the Free Exercise Clause requires Montana to allow petitioners to use taxpayer-supported scholarships to pay for their children's religious education, the majority makes several doctrinal innovations that, in my view, are misguided and threaten adverse consequences.

Although the majority refers in passing to the "play in the joints" between that which the Establishment Clause forbids and that which the Free Exercise Clause requires, its holding leaves that doctrine a shadow of its former self. See, *e.g.*, *Cutter*, 544 U. S., at 719; *Walz*, 397 U. S., at 669. Having concluded that there is no obstacle to subsidizing a religious education under our Establishment Clause precedents, the majority says little more about Montana's anti-establishment interests or the reasoning that underlies them. It does not engage with the State's concern that its funds not be used to support religious teaching. Instead, the Court holds that it need not consider how Montana's funds would be used because, in its view, all distinctions on the basis of religion—whether in respect to playground grants or devotional teaching—are similarly and presumptively unconstitutional. See *ante*, at 10.

Setting aside the problems with the majority's characterization of this case, *supra*, at 7–8, I think the majority is wrong to replace the flexible, context-specific approach of our precedents with a test of "strict" or "rigorous" scrutiny. And it is wrong to imply that courts should use that same heightened scrutiny whenever a government benefit is at issue. See *ante*, at 9, 11–12.

Experience has taught us that "we can only dimly perceive the boundaries of permissible government activity in this sensitive area of constitutional adjudication." *Tilton* v. *Richardson*, 403 U. S. 672, 678 (1971) (plurality opinion); see also *Schempp*, 374 U. S., at 306 (opinion of Goldberg, J., joined by Harlan, J.) (there is "no simple and clear measure which by precise application can readily and invariably demark the permissible from the impermissible"); *Walz*, 397 U. S., at 669 ("[R]igidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited"). If the Court has found it possible to walk what we have called the "'tight rope'" between the two Religion

Clauses, it is only by "preserving doctrinal flexibility and recognizing the need for a sensible and realistic application" of those provisions. *Yoder*, 406 U. S., at 221.

The Court proceeded in just this way in *Locke*. It considered the same precedents the majority today cites in support of its presumption of unconstitutionality. But it found that applying the presumption set forth in those cases to Washington's decision not to fund devotional degrees would "extend" them "well beyond not only their facts but their reasoning." 540 U. S., at 720. In my view, that analysis applies equally to this case.

Montana's law does not punish religious exercise. Cf. *Locke*, 540 U. S., at 720 (citing *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 535 (1993)); see *ante*, at 11. It does not deny anyone, because of their faith, the right to participate in political affairs of the community. Cf. *Locke*, 540 U. S., at 720–721 (citing *McDaniel* v. *Paty*, 435 U. S. 618, 626 (1978)); see *ante*, at 11–12. And it does not require students to choose between their religious beliefs and receiving secular government aid such as unemployment benefits. Cf. *Locke*, 540 U. S., at 720 (citing *Sherbert* v. *Verner*, 374 U. S. 398, 403–404 (1963)); see *ante*, at 11–12. The State has simply chosen not to fund programs that, in significant part, typically involve the teaching and practice of religious devotion. And "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny." *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540, 549 (1983); see also *Lyng* v. *Automobile Workers*, 485 U. S. 360, 368 (1988).

I disagree, then, with what I see as the majority's doctrinal omission, its misplaced application of a legal presumption, and its suggestion that this presumption is appropriate in many, if not all, cases involving government benefits. As I see the matter, our differences run deeper than a simple disagreement about the application of prior case law.

The Court's reliance in our prior cases on the notion of "play in the joints," our hesitation to apply presumptions of unconstitutionality, and our tendency to confine benefit-related holdings to the context in which they arose all reflect a recognition that great care is needed if we are to realize the Religion Clauses' basic purpose "to promote and assure the fullest scope of religious liberty and religious tolerance for all and to nurture the conditions which secure the best hope of attainment of that end." *Schempp*, 374 U. S., at 305 (opinion of Goldberg, J., joined by Harlan, J.); see *Van Orden* v. *Perry*, 545 U. S. 677, 698 (2005) (BREYER, J., concurring in judgment).

For one thing, government benefits come in many shapes and sizes. The appropriate way to approach a State's benefit-related decision may well vary depending upon the relation between the Religion Clauses and the specific benefit and restriction at issue. For another, disagreements that concern religion and its relation to a particular benefit may prove unusually difficult to resolve. They may involve small but important details of a particular benefit program. Does one detail affect one religion negatively and another positively? What about a religion that objects to the particular way in which the government seeks to enforce mandatory (say, qualification-related) provisions of a particular benefit program? See, *e.g.*, *New Life Baptist Church Academy* v. *East Longmeadow*, 885 F. 2d 940 (CA1 1989) (BREYER, J., for the court). Or the religious group that for religious reasons cannot accept government support? See Brief for Respondents 20–21 (noting, *inter alia*, Seventh-day Adventists' support for Montana's no-aid provision on this ground). And what happens when qualification requirements mean that government money flows to one religion rather than another? Courts are ill equipped to deal with such conflicts. Yet, in a Nation with scores of different religions, many such disagreements are possible. And I have only scratched the surface.

The majority claims that giving weight to these considerations would be a departure from our precedent and give courts too much discretion to interpret the Religion Clauses. See *ante*, at 16–18. But we have long understood that the "application" of the First Amendment's mandate of neutrality "requires interpretation of a delicate sort." *Schempp*, 374 U. S., at 226. "Each value judgment under the Religion Clauses," we have explained, must "turn on whether particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so." *Walz*, 397 U. S., at 669.

Nor does the majority's approach avoid judicial entanglement in difficult and sensitive questions. To the contrary, as I have just explained, it burdens courts with the still more complex task of untangling disputes between religious organizations and state governments, instead of giving deference to state legislators' choices to avoid such issues altogether. At the same time, it puts States in a legislative dilemma, caught between the demands of the Free Exercise and Establishment Clauses, without "breathing room" to help ameliorate the problem.

I agree with the majority that it is preferable in some areas of the law to develop generally applicable tests. The problem, as our precedents show, is that the interaction of the Establishment and Free Exercise Clauses makes it particularly difficult to design a test that vindicates the Clauses' competing interests in all—or even most—cases. That is why, far from embracing mechanical formulas, our precedents repeatedly and frankly acknowledge the need for precisely the kind of "'judgment-by-judgment analysis'" the majority rejects. *Ante*, at 17; see, *e.g.*, *Walz*, 397 U. S., at 669. "The standards" of our prior decisions, we have said, "should rather be viewed as guidelines with which to identify instances in which the objectives of the Religion Clauses have been impaired." *Tilton*, 403 U. S., at 678 (plurality opinion); accord, *Nyquist*, 413 U. S., at 773, n. 31.

The Court's occasional efforts to declare rules in spite of this experience have failed to produce either coherence or consensus in our First Amendment jurisprudence. See *Van Orden*, 545 U. S., at 697 (BREYER, J., concurring in judgment) (listing examples). The persistence of such disagreements bears out what I have said—namely, that rigid, bright-line rules like the one the Court adopts today too often work against the underlying purposes of the Religion Clauses. And a test that fails to advance the Clauses' purposes is, in my view, far worse than no test at all.

Consider some of the practical problems that may arise from the Court's holding. The States have taken advantage of the "play in the joints" between the Religion Clauses to craft programs of public aid to education that address their local needs. Many provide assistance to families with students in nonpublic schools, ranging from scholarships to tax credits and deductions that reimburse tuition expenses. See Dept. of Ed., A Duncan et al., Education Options in the States 3–6 (2009). Although most state constitutions today have no-aid provisions like Montana's, those provisions are only one part of a broader system of local regulation. See App. D to Brief for Respondents. Some States have concluded that their no-aid provisions do not bar scholarships to students at religious schools, while others without such clauses have nevertheless chosen not to fund religious education. See Brief for State of Colorado et al. as *Amici Curiae* 6–7; Brief for State of Maine as *Amicus Curiae* 10–15. Today's decision upends those arrangements without stopping to ask whether they might actually further the objectives of the Religion Clauses in some or even many cases.

And what are the limits of the Court's holding? The majority asserts that States "need not subsidize private education." *Ante*, at 20. But it does not explain why that is so. If making scholarships available to only secular nonpublic schools exerts "coercive" pressure on parents whose faith impels them to enroll their children in religious schools,

then how is a State's decision to fund only secular *public* schools any less coercive? Under the majority's reasoning, the parents in both cases are put to a choice between their beliefs and a taxpayer-sponsored education.

Accepting the majority's distinction between public and nonpublic schools does little to address the uncertainty that its holding introduces. What about charter schools? States vary widely in how they permit charter schools to be structured, funded, and controlled. See Mead, Devilish Details: Exploring Features of Charter School Statutes That Blur the Public/Private Distinction, 40 Harv. J. Legis. 349, 353–357, 367–368 (2003). How would the majority's rule distinguish between those States in which support for charter schools is akin to public school funding and those in which it triggers a constitutional obligation to fund private religious schools? The majority's rule provides no guidance, even as it sharply limits the ability of courts and legislatures to balance the potentially competing interests that underlie the Free Exercise and Antiestablishment Clauses.

\*    \*    \*

It is not easy to discern "the boundaries of the neutral area between" the two Religion Clauses "within which the legislature may legitimately act." *Tilton*, 403 U. S., at 677 (plurality opinion). And it is more difficult still in cases, such as this one, where the Constitution's policy in favor of free exercise, on one hand, and against state sponsorship, on the other, are in conflict. In such cases, I believe there is "no test-related substitute for the exercise of legal judgment." *Van Orden*, 545 U. S., at 700 (opinion of BREYER, J.). That judgment "must reflect and remain faithful to the underlying purposes of the Clauses, and it must take account of context and consequences measured in light of those purposes." *Ibid.* Here, those purposes, along with the examples set by our decisions in *Locke* and *Trinity Lu-*

*theran*, lead me to believe that Montana's differential treatment of religious schools is constitutional. "If any room exists between the two Religion Clauses, it must be here." *Locke,* 540 U. S., at 725. For these reasons, I respectfully dissent from the Court's contrary conclusion.

# SUPREME COURT OF THE UNITED STATES

_____

No. 18–1195

_____

KENDRA ESPINOZA, ET AL., PETITIONERS *v.*
MONTANA DEPARTMENT OF REVENUE, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
MONTANA

[June 30, 2020]

JUSTICE SOTOMAYOR, dissenting.

The majority holds that a Montana scholarship program unlawfully discriminated against religious schools by excluding them from a tax benefit. The threshold problem, however, is that such tax benefits no longer exist for anyone in the State. The Montana Supreme Court invalidated the program on state-law grounds, thereby foreclosing the as-applied challenge petitioners raise here. Indeed, nothing required the state court to uphold the program or the state legislature to maintain it. The Court nevertheless reframes the case and appears to ask whether a longstanding Montana constitutional provision is facially invalid under the Free Exercise Clause, even though petitioners disavowed bringing such a claim. But by resolving a constitutional question not presented, the Court fails to heed Article III principles older than the Religion Clause it expounds. *Coleman* v. *Thompson*, 501 U. S. 722, 730 (1991) (forbidding "resolution of a federal question" that "cannot affect" a state-court judgment).

Not only is the Court wrong to decide this case at all, it decides it wrongly. In *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. \_\_\_ (2017), this Court held, "for the first time, that the Constitution requires the government to provide public funds directly to a church." *Id.*, at \_\_\_ (SOTOMAYOR, J., dissenting) (slip op., at 1). Here, the

Court invokes that precedent to require a State to subsidize religious schools if it enacts an education tax credit. Because this decision further "slights both our precedents and our history" and "weakens this country's longstanding commitment to a separation of church and state beneficial to both," *ibid.*, I respectfully dissent.

## I
## A

The Montana Supreme Court invalidated a state tax-credit program because it was inconsistent with the Montana Constitution's "no-aid provision," Art. X, §6(1), which forbids government appropriations for sectarian purposes, including funding religious schools. 393 Mont. 446, 467–468, 435 P. 3d 603, 614 (2018). In so doing, the court expressly declined to resolve federal constitutional issues. "Having concluded the Tax Credit Program violates" the no-aid provision, the court held, "it is not necessary to consider federal precedent interpreting the First Amendment's less-restrictive Establishment Clause." *Ibid.* So too the court declined to ground its holding on the Free Exercise Clause. *Ibid.* The court also remedied the only potential harm of discriminatory treatment by striking down the program altogether. After the state court's decision, neither secular nor sectarian schools receive the program's tax benefits.

Petitioners' free exercise claim is not cognizable. The Free Exercise Clause, the Court has said, protects against "indirect coercion or penalties on the free exercise of religion." *Lyng* v. *Northwest Indian Cemetery Protective Assn.*, 485 U. S. 439, 450 (1988). Accordingly, this Court's cases have required not only differential treatment, cf. *ante*, at 11–12, but also a resulting burden on religious exercise, *Lyng*, 485 U. S., at 450–451.

Neither differential treatment nor coercion exists here because the Montana Supreme Court invalidated the tax-credit program entirely. 393 Mont., at 467–468, 435 P. 3d,

at 614. Because no secondary school (secular or sectarian) is eligible for benefits, the state court's ruling neither treats petitioners differently based on religion nor burdens their religious exercise. See *ante*, at 2–6 (GINSBURG, J., dissenting). Petitioners remain free to send their children to the religious school of their choosing and to exercise their faith.

To be sure, petitioners may want to apply for scholarships and would prefer that Montana subsidize their children's religious education. But this Court had never before held unconstitutional government action that merely failed to benefit religious exercise. "The crucial word in the constitutional text is 'prohibit': 'For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.'" *Lyng*, 485 U. S., at 451 (quoting *Sherbert* v. *Verner*, 374 U. S. 398, 412 (1963) (Douglas, J., concurring)). Put another way, the Constitution does not compel Montana to create or maintain a tax subsidy.

Notably, petitioners did not allege that the no-aid provision itself caused their harm or that invalidating the entire tax-credit scheme would create independent constitutional concerns. Even now, petitioners disclaim a facial challenge to the no-aid provision. Reply Brief 8, 20–22. Petitioners thus have no cognizable as-applied claim arising from the disparate treatment of religion, because there is no longer a program to which Montana's no-aid provision can apply.

Nor is it enough that petitioners might wish that Montana's no-aid provision were no longer good law. Petitioners identify no disparate treatment traceable to the state constitutional provision that they challenge because the tax-credit program no longer operates. See *Simon* v. *Eastern Ky. Welfare Rights Organization*, 426 U. S. 26, 41–42, 44–46 (1976).[1] Short of ordering Montana to create a religious

---

[1] To revive their as-applied challenge, petitioners rely on *Griffin* v.

subsidy that Montana law does not permit, there is nothing
for this Court to do.[2]

———————

*School Bd. of Prince Edward Cty.*, 377 U. S. 218 (1964), for the proposi-
tion that eliminating a public benefit does not always remedy discrimi-
nation. See Reply Brief 5. But *Griffin* is inapposite. There, a Virginia
county closed its public schools and so-called "private schools" were set
up in their place to avoid a court desegregation order. See 377 U. S., at
223. These so-called private schools "were open to whites only and . . .
were in fact run by a practical partnership between State and county,
designed to preserve segregated education." *Palmer* v. *Thompson*, 403
U. S. 217, 221–222 (1971). That is nothing like what the Montana Su-
preme Court's remedy achieved here. Nor have petitioners said other-
wise; there is no allegation that Montana confers clandestine tax credits
solely to secular schools.

   [2] Petitioners here have not asserted a free exercise claim on a theory
that they were victims of religious animus, either. Cf. *Church of Lukumi
Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 533 (1993). Instead, one con-
currence seeks to make the argument for them while attempting to com-
pare the state constitutional provision here with a nonunanimous jury
rule rooted in racial animus. *Ante*, at 1 (opinion of ALITO, J.) (citing the
dissent in *Ramos* v. *Louisiana*, 590 U. S. ___ (2020)). But those questions
are not before the Court.

   In any case, the concurrence's arguments are as misguided as they are
misplaced. Citing the Court's opinion in *Ramos*, the concurrence main-
tains that a law's "'uncomfortable past' must still be '[e]xamined.'" *Ante*,
at 10 (opinion of ALITO, J.). But as previously explained: "Where a law
otherwise is untethered to [discriminatory] bias—and perhaps also
where a legislature actually confronts a law's tawdry past in reenacting
it—the new law may well be free of discriminatory taint." *Ramos*, 590
U. S., at ___ (SOTOMAYOR, J., concurring in part) (slip op., at 4). That
could not "be said of the laws at issue" in *Ramos*. *Ibid.* It can be here.
See Part II, *infra*.

   The concurrence overlooks the starkly different histories of these state
laws. Also missing from the concurrence (and the *amicus* briefs it re-
peats) is the stubborn fact that the constitutional provision at issue here
was adopted in 1972 at a convention where it was met with overwhelm-
ing support by religious leaders (Catholic and non-Catholic), even those
who examined the history of prior no-aid provisions. See Brief for Re-
spondents 16–27; 6 Montana Constitutional Convention 1971–1972 Pro-
ceedings and Transcript, pp. 2012–2013, 2016–2017 (Mont. Legislature
and Legislative Council); see also *ante*, at 12–13 (BREYER, J., dissenting);

## B

As another dissenting opinion observes, see *ante,* at 3 (opinion of GINSBURG, J.), the Court sidesteps these obstacles by asking a question that this case does not raise and that the Montana Supreme Court did not answer: whether by excluding "religious schools and affected families from [a scholarship] program," Montana's no-aid provision was "consistent with the Federal Constitution," *ante*, at 7 (majority opinion). In so doing, the Court appears to transform petitioners' as-applied challenge into a facial one. *Ante*, at 10; see also *ante*, at 1 (THOMAS, J., concurring).

This approach lacks support in our case law. The Court typically declines to read state-court decisions as impliedly resolving federal questions, especially ones not raised by the parties. See, *e.g.*, *Adams* v. *Robertson*, 520 U. S. 83, 88–89 (1997) (*per curiam*). Indeed, to honor principles of comity, this Court generally dismisses writs of certiorari from a State's highest court where, as is true here of the Court's bespoke inquiry, "the sole federal question" the Court seeks to decide was not "raised, preserved, or passed upon in the state courts below." *Cardinale* v. *Louisiana*, 394 U. S. 437, 438 (1969); see also *Webb* v. *Webb*, 451 U. S. 493, 499 (1981).

That rule respects not only federalism, but also the separation of powers. Article III confines this Court's authority to adjudicating actual "[c]ases" or "[c]ontroversies." See also *Allen* v. *Wright*, 468 U. S. 737, 750 (1984) (case-or-controversy requirement reflects "the idea of separation of powers on which the Federal Government is founded"). Federal courts thus lack power "to decide questions that cannot affect the rights of litigants in the case before them" and may

_____

Brief for Public Funds Public Schools as *Amicus Curiae* 5–11; Brief for Montana Constitutional Convention Delegates as *Amici Curiae* 19–25. These supporters argued that it would be wrong to put taxpayer dollars to religious purposes and that it would invite unwelcome entanglement between church and state. See, *e.g.*, U. S. Const., Amdt. 1; Brief for Respondents 20.

resolve only "real and substantial controvers[ies] admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Lewis* v. *Continental Bank Corp.*, 494 U. S. 472, 477 (1990) (alteration in original; internal quotation marks omitted). Consonant with that limitation, the Court has declined to "'"formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied."'" *Washington State Grange* v. *Washington State Republican Party*, 552 U. S. 442, 450 (2008) (quoting *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring)). By answering an apparent hypothetical question, today's Court subverts these longstanding practices.

True, on occasion this Court has resolved federal constitutional questions when it was unclear whether the state-court judgment rested on an adequate and independent state-law ground. See, *e.g.*, *Michigan* v. *Long*, 463 U. S. 1032, 1043 (1983). But that is not this case. Recall that the Montana Supreme Court remedied a state constitutional violation by invalidating a state program on state-law grounds, having expressly declined to reach any federal issue. See 393 Mont., at 467–468, 435 P. 3d, at 614; see also *ante*, at 4–5 (GINSBURG, J., dissenting).

These principles exist to prevent this Court from issuing advisory opinions, sowing confusion, and muddying the law. This is case in point. Having held that petitioners may not be "exclu[ded] from the scholarship program" that no longer exists, the Court remands to the Montana Supreme Court for "further proceedings not inconsistent with this opinion." *Ante*, at 22. But it is hard to tell what this Court wishes the state court to do. There is no program from which petitioners are currently "exclu[ded]," so must the Montana Supreme Court order the State to recreate one? Has this Court just announced its authority to require a

state court to order a state legislature to fund religious exercise, overruling centuries of contrary precedent and historical practice? See *Cutter* v. *Wilkinson*, 544 U. S. 709 (2005); *Locke* v. *Davey*, 540 U. S. 712 (2004); see also *Trinity Lutheran*, 582 U. S., at \_\_\_–\_\_\_, and nn. 7–11 (SOTOMAYOR, J., dissenting) (slip op., at 12–20, and nn. 7–11) (describing States' religious disestablishment movements near the founding and cataloging state constitutional provisions declining to aid religious ministry). Indeed, it appears that the Court has declared that once Montana created a tax subsidy, it forfeited the right to eliminate it if doing so would harm religion. This is a remarkable result, all the more so because the Court strains to reach it.

The Court views its decision as "simply restor[ing] the status quo established by the Montana Legislature." *Ante* at 22, n. 4. But it overlooks how that status quo allowed the State Supreme Court to cure any disparate treatment of religion while still giving effect to a state constitutional provision ratified by the citizens of Montana. Today's decision replaces a remedy chosen by representatives of Montanans and designed to honor the will of the electorate with one that the Court prefers instead.

In sum, the decision below neither upheld a program that "disqualif[ies] some private schools solely because they are religious," *ante*, at 20, nor otherwise decided the case on federal grounds. The Court's opinion thus turns on a counterfactual hypothetical it is powerless (and unwise) to decide.

## II

Even on its own terms, the Court's answer to its hypothetical question is incorrect. The Court relies principally on *Trinity Lutheran*, which found that disqualifying an entity from a public benefit "solely because of [the entity's] religious character" could impose "a penalty on the free exercise of religion." 582 U. S., at \_\_\_–\_\_\_ (slip op., at 9–10).

*Trinity Lutheran* held that ineligibility for a government benefit impermissibly burdened a church's religious exercise by "put[ting it] to the choice between being a church and receiving a government benefit." *Id.*, at ___ (slip op., at 13). Invoking that precedent, the Court concludes that Montana must subsidize religious education if it also subsidizes nonreligious education.[3]

The Court's analysis of Montana's defunct tax program reprises the error in *Trinity Lutheran.* Contra the Court's current approach, our free exercise precedents had long granted the government "some room to recognize the unique status of religious entities and to single them out on that basis for exclusion from otherwise generally applicable laws." *Id.*, at ___ (SOTOMAYOR, J., dissenting) (slip op., at 9).

Until *Trinity Lutheran*, the right to exercise one's religion did not include a right to have the State pay for that religious practice. See *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203, 226 (1963). That is because a contrary rule risks reading the Establishment Clause out of the Constitution. Although the Establishment Clause "permit[s] some government funding of secular functions performed by sectarian organizations," the Court's decisions "provide[d] no precedent for the use of public funds to finance religious activities." *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 847 (1995) (O'Connor, J., concurring). After all, the government must avoid "an unlawful fostering of religion." *Cutter*, 544 U. S., at 714 (internal quotation marks omitted). Thus, to determine the constitutionality of government action that draws lines based on religion, our precedents "carefully considered

––––––––––
[3] Petitioners' as-applied challenge fails under *Trinity Lutheran* for the reasons stated above: The Montana Supreme Court's remedy does not put petitioners to any "choice" at all. Rather, petitioners are free to send their children to any secondary school they wish while practicing their religious beliefs, and no one receives a tax credit for their school choice.

whether the interests embodied in the Religion Clauses justify that line." *Trinity Lutheran*, 582 U. S., at ___ (SOTOMAYOR, J., dissenting) (slip op., at 8). The relevant question had always been not whether a State singles out religious entities, but why it did so.

Here, a State may refuse to extend certain aid programs to religious entities when doing so avoids "historic and substantial" antiestablishment concerns. *Locke*, 540 U. S., at 725. Properly understood, this case is no different from *Locke* because petitioners seek to procure what the plaintiffs in *Locke* could not: taxpayer funds to support religious schooling.[4] Indeed, one of the concurrences lauds petitioners' spiritual pursuit, acknowledging that they seek state funds for manifestly religious purposes like "teach[ing] religion" so that petitioners may "outwardly and publicly" live out their religious tenets. *Ante*, at 3 (opinion of GORSUCH, J.). But those deeply religious goals confirm why Montana may properly decline to subsidize religious education. Involvement in such spiritual matters implicates both the Establishment Clause, see *Cutter*, 544 U. S., at 714, and the free exercise rights of taxpayers, "denying them the chance to decide for themselves whether and how to fund religion," *Trinity Lutheran*, 582 U. S., at ___ (SOTOMAYOR, J., dissenting) (slip op., at 17). Previously, this Court recognized that a "prophylactic rule against the use of public funds" for "religious activities" appropriately balanced the Religion Clauses' differing but equally weighty interests. *Ibid.*

The Court maintains that this case differs from *Locke* because no pertinent "'historic and substantial'" tradition supports Montana's decision. *Ante*, at 14. But the Court's

---

[4] *Locke* confirms that a facial challenge to no-aid provisions must fail. But cf. *ante*, at 13–14 (majority opinion). In *Locke*, this Court upheld the application of a materially similar no-aid provision in Washington State, concluding that the Free Exercise Clause permitted Washington to forbid state-scholarship funds for students pursuing devotional theology degrees. 540 U. S., at 721.

historical analysis is incomplete at best. For one thing, the Court discounts anything beyond the 1850s as failing to "establish an early American tradition," *ante*, at 15, while itself relying on examples from around that time, *ante*, at 14. For another, although the States may have had "rich diversity of experience" at the founding, "the story relevant here is one of consistency." *Trinity Lutheran*, 582 U. S., at ___ (SOTOMAYOR, J., dissenting) (slip op., at 11); see also *id.*, at ___–___ (slip op., at 12–20) (chronicling state histories). The common thread was that "those who lived under the laws and practices that formed religious establishments made a considered decision that civil government should not fund ministers and their houses of worship." *Id.*, at ___ (slip op., at 16). And as the Court's recent precedent holds, at least some teachers in religiously affiliated schools are ministers who inculcate the faith. See *Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC*, 565 U. S. 171, 178, 196 (2012); see also *ante*, at 3 (GORSUCH, J., concurring); *ante*, at 6, 13 (BREYER, J., dissenting).

The Court further suggests that by abstaining from funding religious activity, the State is "'suppress[ing]'" and "penaliz[ing]" religious activity. *Ante*, at 19–20. But a State's decision not to fund religious activity does not "disfavor religion; rather, it represents a valid choice to remain secular in the face of serious establishment and free exercise concerns." *Trinity Lutheran*, 582 U. S., at ___ (SOTOMAYOR, J., dissenting) (slip op., at 24). That is, a "legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540, 549 (1983).

Finally, it is no answer to say that this case involves "discrimination." *Ante*, at 11–12. A "decision to treat entities differently based on distinctions that the Religion Clauses make relevant does not amount to discrimination." *Trinity Lutheran*, 582 U. S., at ___ (SOTOMAYOR, J., dissenting) (slip op., at 22). So too here.

\*　　\*　　\*

Today's ruling is perverse. Without any need or power to do so, the Court appears to require a State to reinstate a tax-credit program that the Constitution did not demand in the first place. We once recognized that "[w]hile the Free Exercise Clause clearly prohibits the use of state action to deny the rights of free exercise to anyone, it has never meant that a majority could use the machinery of the State to practice its beliefs." *Schempp*, 374 U. S., at 226 (emphasis deleted). Today's Court, by contrast, rejects the Religion Clauses' balanced values in favor of a new theory of free exercise, and it does so only by setting aside well-established judicial constraints.

I respectfully dissent.